UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 06-11504RCL

| | |
|---|---|
| MICHAEL BLOUNT,<br>    Plaintiff | ) ) |
| v. | ) ) |
| TOWN OF STOUGHTON, MANUEL CACHOPA<br>and CHRISTOPHER CIAMPA, Individually and in<br>His Official Capacity,<br>    Defendants.. | ) ) ) ) ) |

# EXHIBITS TO

# PLAINTIFF'S L.R 56.1 STATEMENT OF MATERIAL FACTS

EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 06-11504RCL

| | |
|---|---|
| MICHAEL BLOUNT,<br>        Plaintiff<br>v.<br><br>TOWN OF STOUGHTON, MANUEL CACHOPA<br>and CHRISTOPHER CIAMPA, Individually and in<br>His Official Capacity,<br>        Defendants.. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF MICHAEL BLOUNT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1.      I, Michael Blount, have personal knowledge of the facts set forth below and on the basis of that personal knowledge depose and state the following:

2.      I have been a police officer in the Stoughton Police Department for over twenty years.  I started out as a patrolman and about seven years later  became a sergeant after taking a qualifying promotional examination.  In 2002, I became the first black lieutenant in the Stoughton police department through another promotional exam.  During the over twenty years that I have been on the force, I have been the only black superior officer in a department consisting of about 60 officers.  I have a Bachelors Degree in Law Enforcement and a Masters Degree in Criminal Justice.

3.      When I was assigned to conduct an investigation into Timothy Hills complaint about Sgt. David Cohen ("Cohen"), I kept Chief Manuel Cachopa ("Cachopa") apprised of the facts that were coming to light.  Whenever I informed Cachopa of facts that appeared to support Hills' complaint, Cachopa would ask me questions such as, "Why are you digging so deep?"  Cachopa

would also say things to me like: "You're trying to f___ the officer. You've got nothing. You've

got no witnesses." When I asked Cachopa for permission to talk to the district attorney and to

subpoena phone records relevant to the investigation, Cachopa denied those requests. It became

clear to me that Cachopa wanted me to bury the complaint. However, the facts I uncovered

would not support such action. Cachopa told me to write up a report. In January 2003, I started

a report about the investigation noting that David Cohen had made inaccurate and inconsistent

statements concerning the matter. The report was finalized in March 2003. On February 4,

2003, during the time period that I was writing up the report, Cachopa made the racial remark

concerning the computer, and when I objected to the discriminatory remark, he angrily followed

me into the men's room. He was beet red in the face, and screaming at me. He came up very

close to me, raising his arms and I thought he was going to hit me. Ultimately in my report, I

recommended that all charges against Timothy Hills be dropped and his record expunged. The

District Attorney dropped charges against Hills.

4.      In July of 2004 when Cachopa's contract as Chief was not renewed, Lieut. David

Chamberlin ("Chamberlin")was appointed to serve as Interim Chief while a search was

conducted to hire a permanent replacement for Cachopa. During the time that Chamberlin served

as acting chief, I functioned as the second in command of the department. My job title was

"Administrative Lieutenant." I applied for the position of Chief and was one of the three finalists

for the position. Sgt. Christopher Ciampa ("Ciampa") also applied for the position, but was not

one of the finalists.

5.      In the time period prior to the recall election of November 2004, several officers who

were involved in the incidents being investigated by the Special Prosecutor were put on

administrative leave. The officers who were put on administrative leave included Cohen and

Cachopa. The recall election in November 2004 was successful, and Cachopa supporters gained

control of the board of selectmen.  With the new board of selectmen in place, the Town of

Stoughton ("Stoughton") decided to reinstate Cachopa and the other officers who had been

placed on leave, and reinstate Cachopa as Chief. Almost immediately after his reinstatement,

Cachopa issued orders that: 1) directing that I move out of the office that I occupied; 2) assigning

me to the "graveyard" shift of 12pm to 8am; 3) appointing Ciampa as the deputy chief – the

position's title later changed to Executive Officer – as supervisor over me and the other

lieutenants in the department.  My duties were changed including being assigned as shift

supervisor of the "graveyard' shift, being stripped of authority as Internal Affairs investigator,

and replaced with  the unpopular responsibility of scheduling and billing details.  I was removed

from my position as Executive Officer and replaced with Ciampa who was only a sergeant.  Later

on I was also stripped of my responsibilites as department accident investigator.

6.      In separate letters written in December 2004 Chamberlin, Lieut. Wohlgemuth, and I

complained about the hostile working environment that had been imposed on us after Cachopa

was reinstated as Chief.   Stoughton hired an attorney, Mark L. Terry of the law firm Mirick,

O'Connell, DeMaillie & Lougee, LLP, to conduct an investigation into our allegations.  I was

interviewed by Terry on or about February 3, 2005. During that interview, I told him that I

believed that one of the reasons for the adverse treatment that I was subjected to was my race and

that discrimination was a factor in that treatment

7.      In the past under Chief Cachopa, I have participated in and supervised community policing

programs similar to the ones currently in use by Stoughton.  The Stoughton Police department

has for many years received grants that pay for activities associated with community policing

ideals. Police officers taking part in the community policing program are paid overtime from

grant proceeds and/or receive compensatory time off whenever they participate in these activities.

Only officers designated as community policing officers are allowed to participate in such

programs. There are designated community policing officers on all three shifts. Currently, three

patrol officers and one sergeant on the midnight to eight shift are community policing officers.

An additional sergeant and one patrol officer took part in the program when they were members

of the 12 – 8 shift but now participate as members of both the 8 – 4 and 4 – 12 shift respectively.

I am personally aware of community policing activities such as an open gym which is a

recreational activity supervised by a community policing officer that generally takes place after

4:00 P.M. daily during the week. Also, mountain bike patrols that are scheduled and do in fact

take place after 4:00 P.M. during the warm weather months. There are also community policing

activities that do not take place within the usual Monday through Friday time frame such as

infant car seat installations that generally take place on weekends. I expressed an interest in

participating in the current program sometime in 2007 to Lieut. Devine, but my interest was met

with a hostile response and I never received any feedback. So, I abandoned my efforts.

8.     Prior to the reinstatement of Cachopa I had never had any disciplinary action taken against

me. After Cachopa was reinstated and Ciampa became Executive Officer and later acting Chief,

there were many meritless attempts to discipline or fire me. On each occasion when the facts

underlying the attempts to discipline me were either reviewed by or grieved to a party outside of

the police department, the Town Manager, they were not supported.

4

Signed under pains and penalties of perjury:

Michael Blount

Dated: _____ 2/4/09

EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 06-11504RCL

MICHAEL BLOUNT,               )
    Plaintiff              )
v.                            )
                           )
TOWN OF STOUGHTON, MANUEL CACHOPA   )
and CHRISTOPHER CIAMPA, Individually and in   )
His Official Capacity,        )
    Defendants.           )
                           )

## AFFIDAVIT OF JOSEPH PASCARELLI

I, Joseph Pascarelli, depose and state the following:

1. I am making this statement on the basis of my own personal knowledge and experience.

2. I have known Manny Cachopa for a very long time. We went to high school together. We played sports together. Even after high school, we used to go to the gym together to work out. While we were not best friends, we did socialize together, and would meet up sometimes at places like the Legion Hall. Not only did I know Manny Cachopa socially, but we also worked together in the Stoughton Police Department for over 20 years. Having known Manny Cachopa for over 30 years, I feel that I can say with a fair amount of certainty that he is biased against black people.

3. Manny Cachopa demonstrated his bias as far back as high school. When he was in school, he generally liked sports. However, he hated basketball. He used to make comments like, "Why would anyone want to watch black players running up and down a court?" He did not socialize with any black students and seemed to not want to have anything to do with them.

4. Later on as an adult, Manny Cachopa's prejudice would slip out on occasion. For instance, I remember once when we had been out together at the Legion Hall, and I was driving him home. Manny was going on about what a hard time he had getting over the fact that his wife had formally dated a black guy. He seemed to be almost on the verge of tears.

5. On another occasion, Kenny Allen, a black police officer who was a bodybuilder, was showing some pictures of himself that he had taken for an upcoming bodybuilding contest. Manny Cachopa was there along with myself and some other officers looking at the pictures. I recall that after Kenny Allen left, Cachopa made the comment "Monkey" in reference to Allen.

6. After having known Manny Cachopa for as long as I have, there is little doubt in my mind that he harbors racial animus towards black people.

Signed under pains and penalties of perjury.

Joseph Pascarelli

Dated: 2/4/09

EXHIBIT 13

```
VOLUME:  1
PAGES:   1-224
EXHIBITS:1-3
```

\\

NORFOLK, SS.

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

* * * * * * * * * * * * * * *

MICHAEL BLOUNT,
                Plaintiff

VERSUS                              * CA NO. 06-01121

TOWN OF STOUGHTON, MANUEL
CACHOPA and CHRISTOPHER CIAMPIA
Individually and in His
Official Capacity,
                Defendant

* * * * * * * * * * * * * * *

DEPOSITION OF MICHAEL BLOUNT, a witness

called for examination by counsel for the Defendant

pursuant to the Massachusetts Rules of Civil

Procedure before Carolyn McGill, a Shorthand Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at the offices of Kopelman & Paige,

101 Arch Street, Boston, Ma, 02110, on Monday,

September 22, 2008, commencing at 10:03 a.m.

---

**3**

I N D E X

WITNESS          DIRECT CROSS REDIRECT RECROSS

(By Ms. Cowin )    4


E X H I B I T S

NUMBER  DESCRIPTION                    PAGE

1    Complaint and Jury Demand        18

2    Plaintiff's Response to Town of   71
     Stoughton's First Set of
     Interrogatories

3    2004 and 2006 W-2 Forms          110

4    12/3/04 Memorandum from Blount   119
     to Ciampa

5    11/15/04 Investigation of        134
     Complaint of Michael Blount

6    8/28/08 McNally and Associates   154
     Report

7    6/28/02 and 7/4/02 Memoranda     171
     Between Ciampa and Blount

8    3/2/05 Memorandum from Blount    180
     To Ciampa

---

**2**

APPEARANCES:

Leslie B. Greer, Esq.

Law Offices of Leslie B. Greer

875 Massachusetts Avenue

Cambridge, Ma 02139

(For the Plaintiff)



Jackie A. Cowin, Esq.

Michele Randazzo, Esq.

Kopelman & Paige, P.C.

101 Arch Street

Boston, Ma 02110

(For the Defendant)



Stephen C. Pfaff, Esq.

Louison, Costello, Condon & Pfaff, LLP

67 Batterymarch Street

Boston, Ma 02110

(For the Defendant)

---

**4**

P R O C E E D I N G S

**Michael Blount**, having been

satisfactorily identified by the production of

his Stoughton Police Department Identification

Card and duly sworn by the Notary Public, called

on behalf of the Plaintiff, on oath deposes and

says as follows:

**Examination by Ms. Cowin:**

Q.   Good morning, Lieutenant Blount. As

you know, my name is Jackie Cowin.  I represent

the Town of Stoughton in the matter that brings

us here today.  With me is Michele Randazzo who

also represents the town and Steve Pfaff who

represents Manuel Cachopa and Christopher

Ciampa.

Now I'll ask have you ever been

deposed before?

A.   Yes.

Q.   Then you generally know how it works.

I will just go over a few quick ground rules.

If at any time you need a break, as long as a

question is not pending please just say so and

we'll stop either to use the men's room or to

117

119

1  Q. Chamberlain is retired, correct?
2  A. Yes.
3  Q. Do you recall when he retired?
   A. Not exactly, no.
ɔ  Q. Did he go out on sick leave for an
6  extended period prior to retiring?
7  A. Yes.
8  Q. If I said he went out on sick leave in
9  late November 04 does that sound correct?
10 A. Yes, because he was not present for
11 all these changes.
12 Q. Because he was out of the office?
13 A. Right.
14 Q. Then he never came back?
15 A. Correct.
16 Q. So he was not available to perform
17 these functions?
18 A. Correct.
19 Q. You characterize these assignments,
20 detail billing, sex offender registry and
21 details, I think the word you used was
22 unpleasant?
23 A. Yes.

LEAVITT REPORTING, INC.

1  registry.
2  Q. Other than those two assignments there
3  aren't any in the police department that are
4  broadly considered unpleasant?
5  A. Not that I can think of.
6  Q. Are there any other acts that you
7  considered retaliatory by Cachopa?
8  A. Yes. I was thrown out of my office
9  space.
10        (Exhibit No. 4 marked for
11 identification.)
12 Q. Just take a look at what's been marked
13 as Exhibit Four please.
14 A. Okay.
15 Q. This is a letter to you from Deputy
16 Chief Ciampa. It's fair to say that this is
17 notice to you that you will be changing your
18 office?
19 A. Yes.
20 Q. It's from Ciampa, correct?
21 A. Yes.
22 Q. So why do you attribute the office
23 assignment to Cachopa?

LEAVITT REPORTING, INC.

118

120

1  Q. What other unpleasant assignments are
2  there in the police department that you would
3  consider unpleasant?
4  A. None come to mind right off the top of
5  my head.
6  Q. These three, you obviously consider
7  them unpleasant?
8  A. Yes.
9  Q. Are you aware of anyone else who
10 considers them unpleasant?
11 A. Well, let me just say the general
12 feeling in the building is nobody wants to do
13 that. I've asked for volunteers. Nobody
14 volunteers. It's a crap job.
15 Q. All three of them?
16 A. All three?
17 Q. You identified three responsibilities
18 as being unpleasant?
19 A. Sex offender and detail billing.
   What's the third one?
   Q. Just details.
22 A. Just two. All I do -- all I was
23 assigned was detail billing and sex offender

LEAVITT REPORTING, INC.

1  A. He's the Chief of Police. Nothing
2  happens without his say so or his assent.
3  Q. Did you ever discuss the office change
4  with Cachopa?
5        MS. GREER: Objection.
6  A. I never spoke with Cachopa once he was
7  reinstated.
8  Q. What office were you in prior to this
9  occurring, was there a name for it?
10 A. Lieutenant's office.
11 Q. Who was in there with you?
12 A. Both Chamberlain and Wohlgemuth.
13 Three of us.
14 Q. Were you reassigned to the shift
15 supervisor's office?
16 A. I was assigned to the sergeant's
17 office but I was assigned to that corner of the
18 sergeant's office.
19 Q. Meaning?
20 A. In other words, my office went from
21 this big to this big. And all three of us were
22 assigned there.
23 Q. All three of you being who?

LEAVITT REPORTING, INC.

121

1      A.   Chamberlain and Wohlgemuth on paper.
2           MS. GREER:  The record should
3   reflect that as the witness was indicating the
4   change in the size his hands went from being
5   fairly widespread to a narrower position.
6      A.   I will give you one better.  It's
7   about the size of a jail cell.
8      Q.   Which one?
9      A.   The new office.
10     Q.   What is the size of a jail cell
11  approximately?
12     A.   Approximately six by nine, or
13  fifty-six feet.
14     Q.   How big was the lieutenant's office?
15     A.   Approximately four hundred square
16  feet.
17     Q.   Aside from you, Wohlgemuth and
18  Chamberlain was anyone else assigned to that new
19  office?
20     A.   To that new corner, no.  That was our
21  new office space.
22     Q.   Now Chamberlain never came back we've
23  already established?

LEAVITT REPORTING, INC.

122

1      A.   Correct.
2      Q.   And did Wohlgemuth ever move into that
3   office?
4      A.   Actually moved, he never left.  I was
5   the only one who actually physically moved.
6      Q.   So that new office went to you alone?
7           MS. GREER:  Objection.
8      Q.   It was just you in the new office is
9   what you're saying?
10     A.   No.  It didn't go to me alone.  I was
11  the only one to arrive.  All three of us were
12  supposed to be there.  That was the order.
13     Q.   After you went to the new office was
14  there any other police department employee who
15  regularly came to work and sat in that office?
16          MS. GREER:  Objection.
17     A.   Yes.  It was the sergeant's office.
18     Q.   So --
19     A.   There were several other sergeants.
20     Q.   That's my question.  Who else was
21  using that office?
22     A.   The guy I was testifying at the grand
23  jury, Cohen.  McCallum, McGowan, Murphy and I

LEAVITT REPORTING, INC.

123

1   believe Welch.
2      Q.   So that's six people including you
3   that you just named off?
4      A.   If that's what I said.
5      Q.   Were in this six by nine office?
6      A.   No.  No.  We're in a huge room.
7   Everybody had their own desk space.  The six by
8   nine section was reserved for the three
9   lieutenants.
10     Q.   The six by nine space was part of a
11  larger space?
12     A.   Yes.  We were relegated to one corner.
13     Q.   Was there any separation between your
14  space and the larger space?
15     A.   No.
16     Q.   Now I believe it's the second sentence
17  of the letter.  It reads "the location of your
18  new work area will allow you to better carry out
19  your new responsibilities as shift supervisor in
20  that you will be in closer proximity to the
21  dispatch area and therefore able to hear and
22  oversee the running of the shift."  Was the new
23  work area closer to the dispatch area than the

LEAVITT REPORTING, INC.

124

1   lieutenant's office?
2      A.   In terms of the sheer linear feet I
3   think it was about the same, just in a different
4   direction.
5      Q.   Do you dispute Ciampa's statement that
6   the new work area allowed you to better carry
7   out your responsibilities?
8           MS. GREER:  Objection.
9      A.   I dispute it because they moved me
10  again even further away than this purports to be
11  helping me to do my job better.  They ultimately
12  moved me even further away to another office
13  space.
14     Q.   When did they move you again?
15     A.   I was in the six by nine jail cell
16  area for approximately I want to say I think it
17  was about two weeks.  And Ciampa came to me and
18  he said I know you're uncomfortable in here.  If
19  we can find some other space for you or if you
20  can tell us some other space where we can move
21  you we'll consider it.  He said that to me.  He
22  did say that to me.  But I didn't offer anything
23  because I was upset that I was there.

LEAVITT REPORTING, INC.

125

1  Q.  Did you make any response to Ciampa?
2  A.  No.  But I was in this new space with
3  no computer.  In fact, when I moved I took my
4  computer with me, set it up in my little section
5  there and they took it back the next day.  So I
6  had no computer.  All I had was a telephone.
7  Q.  Who took the computer?
8  A.  I don't know.  I assume Ciampa took it
9  because it was back in the office I had vacated
10  and Ciampa was in there.  I inferred that he
11  took it.
12  Q.  Did you ever get a replacement
13  computer?
14  A.  Eventually, yes.
15  Q.  How long?
16  A.  When I moved into the new office there
17  was a computer already in there because they
18  vacated two patrolmen.  This office is even
19  further away from the dispatch area than this
20  office is.  I was there isolated by myself for
21  probably about a year and a half.
22  Q.  Is there a name for the second office
23  that you went into?

LEAVITT REPORTING, INC.

126

1  MS. GREER:  Objection.
2  A.  Is there a name for it?
3  Q.  How do you refer to that office?
4  MS. GREER:  Objection.
5  A.  It was formerly the juvenile officer's
6  office formerly.
7  Q.  And when you were assigned to this
8  formerly juvenile officer's office you were the
9  only one assigned there?
10  A.  I was there by myself.  I was isolated
11  because this office is the furthest away from
12  the control room but it's also on the outside of
13  the physical barrier that you can close off all
14  of the administrative section of the building.
15  This office is outside of it next to the
16  janitor's closet.  So I stayed in there by
17  myself.  I had no internet access.  I requested
18  it.  Ignored.
19  Q.  Who has internet access in the police
20  department?
21  A.  Everybody did.  In fact, there was
22  internet access in the office that they took
23  with them, the juvenile guys.  When they moved

LEAVITT REPORTING, INC.

127

1  out they took their internet access with them,
2  the cable, and took it to their office.  So I
3  was left with no internet access and I
4  complained and I was ignored.
5  Q.  Other than the internet access did you
6  make any other complaints regarding either of
7  the office changes?
8  A.  Yes.  I didn't make any complaints
9  about the first one, the small jail sized one.
10  When I moved into the second office which was
11  bigger I complained about internet access and
12  then I eventually complained about keys.
13  Cachopa had changed all the locks
14  when he was reinstated or most of them.  And I
15  was given a key to my office but that's it.  I
16  formerly had keys to all of the emergency areas
17  of the building like the E911 downstairs and the
18  records rooms.  I asked for keys.
19  I said I'm on the midnight shift
20  now.  We don't have access to supplies, print
21  cartridges, paper for the computer, so on and so
22  forth.  So the response I got back is we'll --
23  I got this back from Ciampa -- we'll put some

LEAVITT REPORTING, INC.

128

1  supplies in the sergeant's office for the
2  midnight shift.
3  I responded back that well,
4  sometimes the sergeant's office is locked and I
5  don't have a key to the sergeant's office where
6  I did before.  Never got a response back.  Wrote
7  again that if there's an emergency in the
8  building, if there's a fire or something
9  downstairs in the telephone bank room or the
10  E911 or I want to let a vendor in to prepare
11  something, I don't have any keys.  That was
12  ignored.  I never got a key.
13  Eventually, I don't know how long
14  it took, but eventually I showed up one night
15  and voila, there was internet access.  I did get
16  internet access eventually.  But it was -- I
17  think it was several months before I got it.
18  But I never did get keys.
19  Q.  What happened to the lieutenant's
20  office that you had previously occupied?
21  A.  Wohlgemuth stayed there, is still
22  there to this day.  Ciampa moved into that
23  office and set up shop as executive officer.

LEAVITT REPORTING, INC.