EXHIBIT 3

**1**

```
 1            Vol. II, pages:  1-74
 2                 Exhibits:  1-2
 3
 4
 5        UNITED STATES DISTRICT COURT
 6        FIRST DISTRICT OF MASSACHUSETTS
 7  _____
 8  MICHAEL BLOUNT,
 9        Plaintiff,
10  vs.            CA No. 06-11504-RCL
11  TOWN OF STOUGHTON, MANUEL CACHOPA
12  and CHRISTOPHER CIAMPA,
13        Defendants.
14  _____
15
16        DEPOSITION OF MANUEL CACHOPA, a
17  witness called for examination by Counsel for the
18  Plaintiff, pursuant to the Federal Rules of Civil
19  Procedure, before Linda M. Ordway, Professional
20  Court Reporter and Notary Public in and for the
21  Commonwealth of Massachusetts, at The Law Offices
22  Leslie B. Greer, 875 Massachusetts Avenue,
23  Cambridge, MA, on Tuesday, October 7, 2009,
24  commencing at 1:07 p.m.
```

**2**

```
 1               APPEARANCES
 2  FOR THE PLAINTIFF:
 3    Leslie B. Greer, Attorney
 4    LAW OFFICE OF LESLIE B. GREER
 5    875 Massachusetts Avenue, Suite 31-33
 6    Cambridge, MA  02139
 7    617-354-8375
 8
 9  FOR THE DEFENDANT, Town of Stoughton:
10    Jackie Cowin, Attorney
11    KOPELMAN AND PAIGE, P.C.
12    101 Arch Street
13    Boston, MA  02110
14    617-556-0007
15
16  FOR THE DEFENDANTS, Cachopa and Ciampa:
17    Stephen C. Pfaff, Esquire
18    LOUISON, COSTELLO, CONDON & PFAFF, LLP
19    67 Batterymarch Street
20    Boston, MA  02110
21    617-439-0305
22
23
24
```

**3**

```
 1               I N D E X
 2
 3  MANUEL CACHOPA               PAGE
 4  Direct Examination by Ms. Greer        4
 5    *stipulations          4
 6    *certification instructions     73
 7
 8
 9             E X H I B I T S
10
11  NO.      DESCRIPTION          PAGE
12   1  interoffice memorandum        26
13   2  interoffice memorandum        39
14
15
16
17
18
19
20
21
22
23
24      (Original exhibits attached to original transcript.)
```

**4**

```
 1             P R O C E E D I N G S
 2               (Ms. Cowin not present.)
 3               MANUEL CACHOPA
 4  a witness called for examination by counsel for the
 5  plaintiff, having been identified and duly sworn,
 6  testified as follows:
 7          MS. GREER:  We are operating under
 8  the usual stipulations in this case.  Waive all
 9  objections and motions to strike, except as to form,
10  until time of trial.  The witness will have an
11  opportunity to read and sign the transcript, but it
12  can be signed under the pains and penalties of
13  perjury.  Anything else?
14          MR. PFAFF:  (Nods head.)
15  DIRECT EXAMINATION BY MS. GREER:
16      Q.  Now, in November of 2004 you were
17  reinstated from administrative leave, correct?
18      A.  I was put back as chief.  There are two
19  incidents.  I don't know which one you are referring
20  to.
21      Q.  Which two instances are you thinking of?
22      A.  One time I was put out on leave and I
23  didn't work, didn't do anything, and I was brought
24  back.  And then when I was working I was put back as
```

5

1 chief. I don't know if they were both in November.
2 The dates I don't recall.
3      Q. Well, do you remember attending a meeting
4 on or about November 15 in Mark Stankiewicz's office
5 in the town hall with other officers who had been
6 put on administrative leave?
7      A. Yes.
8      Q. And that was on or about November 15?
9      A. I have no idea.
10      Q. Do you recollect it was in November 2004?
11      A. I don't recall.
12      Q. Recognizing that you have a limited memory
13 of the meeting, if I was to suggest to you that that
14 meeting took place on or about November 15, 2004,
15 would that be consistent with whatever memory you
16 have?
17          MR. PFAFF: Objection. You can
18 answer.
19          THE WITNESS: Do I answer?
20          MR. PFAFF: Answer.
21      A. I don't know.
22      Q. When you were put back as chief, what is
23 your best recollection as to the time frame that
24 that occurred?

1      A. I don't know. I am going to change things
2 in the department. I don't know, I don't really
3 know. I was going to make changes and in the staff
4 structure of the department and I asked him if he
5 wanted to be part of it and that's how it happened.
6      Q. Had you ever had conversations with
7 anybody else before that time about changing the
8 command structure in the department?
9      A. Oh, yeah.
10      Q. With whom had you had conversations?
11      A. All of them. All of the lieutenants and
12 we had a staff meeting.
13      Q. I'm sorry?
14      A. At a staff meeting.
15      Q. When did that occur?
16      A. Way before everything -- this happened.
17      Q. Are we talking about a year or two?
18      A. Less than a year. Let me see. During a
19 staff meeting before everything happened.
20      Q. Before your contract was not renewed?
21      A. Well, I didn't have a contract. I was in
22 a union.
23      Q. Before you were removed from the position
24 of chief the first time?

6

1      A. As chief, just before Thanksgiving.
2      Q. And that would have been of 2004?
3      A. I guess.
4      Q. Now, had you had any conversations with
5 Chris Ciampa about the management of the police
6 department prior to not having your contract renewed
7 or contract as chief renewed in June of 2004?
8      A. No.
9      Q. When did you first talk to Chris Ciampa
10 about him assuming a management position within the
11 department essentially coming in as second in
12 command in the department?
13      A. I believe when I came back to work.
14      Q. And that would have been approximately
15 sometime in the latter half of November 2004?
16      A. Or December.
17      Q. Didn't you just say you came back in as
18 chief just before Thanksgiving in 2004?
19      A. Yeah.
20      Q. And where did you first have a
21 conversation with Ciampa about him becoming second
22 in command of the department?
23      A. Chief's office.
24      Q. How did the conversation arise?

1      A. Okay.
2          MR. PFAFF: What is the question?
3      Q. The question is: Did the staff meeting
4 happen before you were removed from the position of
5 chief the first time?
6      A. Oh, yeah.
7      Q. How much before?
8      A. I don't know.
9      Q. Was it a year before?
10      A. Oh, no. I used to have staff meetings
11 every few months I guess.
12      Q. And the staff meetings were attended by
13 all the sergeants and all of the lieutenants?
14      A. Yes.
15      Q. So your testimony is all of the superior
16 officers who attended this staff meeting would have
17 heard of this restructure?
18          MR. PFAFF: Objection.
19      A. Yes, we would always change what is going
20 on. Like we would bring up cross-training.
21 Everybody would know everybody's job in case a
22 person got sick or whatever, stuff like that.
23      Q. At that staff meeting had you first raised
24 the topic of having a deputy chief?

1    A. I don't recall.

2    Q. Had you discussed anything else at that

3 staff meeting about any restructuring other than

4 perhaps having cross-training?

5    A. Yeah, we would go over things that

6 happened in the department. I don't know. I really

7 can't recall all of the stuff that went on.

8    Q. At the staff meetings did anybody take

9 notes?

10    A. No.

11    Q. So when was the first time you remember --

12 strike that.

13       You have already told us about when you

14 first had a conversation with Chris Ciampa about

15 becoming second in command. When is the first time

16 that you remember having a conversation with some

17 other person -- any other person -- about having a

18 second in command at the department?

19    A. I discussed, yes, of having a second in

20 man in the police department.

21    Q. Yes?

22    A. Yeah, there was a discussion when I was

23 acting chief. A couple years previously.

24    Q. And that was before you had a three-year

1 contract appointment to the position of chief,

2 correct?

3    A. Correct.

4    Q. And during that three year period you

5 never appointed a second in command, did you?

6    A. Yeah, there was an administrative

7 lieutenant who would usually take the duties of

8 second in command.

9    Q. And the administrative lieutenant, was

10 that a specialist position, how was the

11 administrative lieutenant appointed?

12    A. I would pick them.

13    Q. And did you pick them for a period of time

14 or did you just appoint somebody on a day-to-day

15 basis?

16    A. No, that was somebody I appointed if I

17 went on vacation or stuff like that, he would take

18 over.

19    Q. When you were there on duty, that is, when

20 you were not on vacation or off on training or

21 something like that, did you have a second in

22 command during the three years that you either had

23 appointment as chief or had a contract as chief?

24    A. Yeah, I had, yeah.

1    Q. And how was that second in command

2 appointment made?

3    A. I made it.

4    Q. And did you make it for a period of time

5 or did you only make such appointment when you were

6 going to be on vacation or something to that effect?

7    A. No, there was time.

8    Q. Who was the first person that you

9 appointed as administrative lieutenant?

10    A. Lieutenant Chamberlin.

11    Q. Did you appoint anybody else to the

12 position of administrative lieutenant?

13    A. No.

14    Q. When did you first appoint Chamberlin to

15 the position of administrative lieutenant?

16    A. I think when I became chief.

17    Q. And for how long did he hold that

18 position?

19    A. Until I came back as chief.

20    Q. And does he receive any compensation for

21 that?

22    A. No.

23    Q. Now, when you came back as chief in

24 November of 2004, did you reinstate Lieutenant

1 Chamberlin to the position of administrative

2 lieutenant?

3    A. No.

4    Q. Why not?

5    A. He wanted my position and I didn't want

6 any hard feelings or have any kind of contact with

7 him because of what had happened. And I picked

8 somebody else.

9    Q. Now, when you say that he wanted your

10 position, what do you base that upon?

11    A. He applied for my job when I was out.

12    Q. But he did not get that position, did he?

13    A. No.

14    Q. Chief Saccardo was appointed instead?

15    A. Yes.

16    Q. Did you have any conversation with

17 Chamberlin after Saccardo was appointed as chief?

18    A. No. Chamberlin never came back to work.

19 There was a couple of weeks -- IP it out, anybody

20 want the job first -- and there was a couple of

21 weeks and he never came back to work. When I came

22 back he never came back to work. And I had to make

23 a move so...

24    Q. So how did you put it out if anybody

1  wanted the position?

2      A. I put it on a clipboard I believe.

3      Q. It was posted in some way?

4      A. Yes.

5      Q. And?

6      A. -- I believe so. I think, I don't

7  remember. I usually post things like that.

8      Q. An that would have been your practice in

9  that instance, correct?

10     A. I hope so, yeah.

11     Q. And where was this clip board normally

12 positioned within the station?

13     A. It's positioned in the control room but

14 always brought at role call and everything that is

15 on the clip board like policy changes or law changes

16 or anything that's happened the night before or

17 directed patrols or stuff is always read at every

18 roll call.

19     Q. So virtually all of the officers in the

20 department would have known you were looking to have

21 a second in command and were seeking people to apply

22 for the job, correct?

23     A. Yes, I believe so.

24     Q. But nobody applied for the position?

1      A. No.

2      Q. And so you on your own raised the topic

3  with Ciampa because nobody else applied for the

4  position?

5      A. I believe so. I don't remember.

6      Q. Did he offer any explanation why he had

7  not applied for the position?

8      A. No, I don't remember a conversation.

9      Q. Did Chris Ciampa's support for Selectman

10 Kowalsick factor into your decision to appoint him

11 to be your second in command?

12     A. No.

13     Q. Have you ever heard of a cable TV program

14 hosted by Chris Ciampa called "Enough is Enough"?

15     A. Yes, I heard of it.

16     Q. Did you ever view it?

17     A. No.

18     Q. What had you heard about the program?

19     A. Well, it was in court, one of these cases

20 I guess. Something came up about it. I don't know

21 where I heard about it that he had a show. And I

22 really don't know where.

23     Q. Did you hear that the purpose of show was

24 to support the recall election?

1      A. No.

2      Q. Did you ever talk to Chris Ciampa about

3  the show?

4      A. No, I never did. I don't believe I ever

5  did.

6      Q. Did Selectman Kowalsic have a relative who

7  worked in the Stoughton Police Department?

8      A. Yes, he has a son, yes.

9      Q. And did you ever have an opportunity to

10 witness Chris Ciampa's interaction -- strike that.

11     What was his son's name?

12     A. Craig.

13     Q. Did you ever have an opportunity to

14 witness Chris Ciampa's interaction with Craig

15 Kowalsic?

16     A. No.

17     Q. Did you ever have conversations with

18 anybody about Chris Ciampa's interaction with Craig

19 Kowalsic?

20     A. No.

21     Q. What position did Craig Kowalsic have in

22 the department?

23     A. He was a police dispatcher.

24     Q. Now, during the time that you were at the

1  department did other dispatchers ultimately apply

2  for and become police officers?

3      A. I'm sorry, can you repeat that question?

4      Q. During the time that you were at the

5  department, did other dispatchers who initially

6  started as dispatcher apply and become police

7  officers at the department?

8      A. Yes.

9      Q. Did Kowalsic ever do that?

10     A. No.

11     Q. Do you know why he did not do that?

12     A. He has muscular dystrophy.

13     Q. Now, when you first talked to Chris Ciampa

14 about becoming your second in command, did you

15 discuss with him what his job responsibilities would

16 be?

17     A. Overseeing the department and handling

18 everything with the lieutenants and sergeants.

19     Q. And handling everything but the

20 lieutenants and sergeants?

21     A. No, handling everything with the

22 lieutenants and sergeants.

23     Q. Right. Did you talk to him about what his

24 job title would be?

1   A. Briefly I came up with the title deputy
2 chief.
3   Q. How did you come up with that title?
4   A. I just said "deputy chief."
5   Q. And did you appoint him to that position?
6   A. Yes, I did.
7   Q. And for how long did he hold that
8 position?
9   A. Four years maybe.  I don't know, a long
10 time.  He held it until he retired.
11   Q. An you are referring to this past June
12 when he retired?
13   A. Yes, a little over three and a half years
14 I believe.
15   Q. And you believe he was deputy chief during
16 that whole period of time?
17   A. Acting chief, he is acting chief.
18   Q. When he was acting chief he was in charge
19 of the entire police department, correct?
20   A. Um-um.
21     MR. PFAFF:  Yes, you have to answer
22 audibly, Manny.
23   A. Yes, yes.  I'm sorry.
24   Q. My question was a little different.  For

1 how long did he hold this position as deputy chief?
2     MR. PFAFF:  This is Ciampa.
3   Q. Ciampa.
4   A. There was a discussion on the title that I
5 wouldn't make him deputy chief because of Civil
6 Service.  So he ended up having a different title.
7   Q. And that would have been an executive
8 title?
9   A. I don't remember the exact title.  There
10 were so many going on around that time.  I really
11 don't remember.
12   Q. You said this was a discussion.  With whom
13 did the discussion take place?
14   A. Mark Stanklewicz.
15   Q. And who was present -- first of all, was
16 there one discussion or more than one discussion?
17   A. I believe it was one discussion.
18   Q. And that was between just you and
19 Stanklewicz over the phone?
20   A. I believe so.
21   Q. And to the best of your recollection and
22 understanding that was a while ago.  Tell us what
23 you said to him and what he said to you?
24   A. He said I couldn't make him deputy chief

1 and I would have to pick another title.
2   Q. It's your understanding that Stankiewicz
3 suggested that another title be picked?
4     MR. PFAFF:  Yes or no.
5   A. Yes.
6   Q. Did you ever have interaction with the
7 Civil Service, the state Civil Service department,
8 about finding a way around the prohibition of having
9 a position of deputy chief?
10     MR. PFAFF:  Objection to the term
11 "state Civil Service department."
12   Q. Let me go back.  Do you have any
13 understanding as to there being an agency that runs
14 the state Civil Service system?
15   A. Yes.
16   Q. What is your understanding as to the name
17 of that agency?
18   A. I used to know it.
19     MR. PFAFF:  It is not a trick
20 question.
21   A. Mass. State Civil Service Board.  I don't
22 know.
23   Q. Did you have any interaction with that
24 agency about finding a way around the prohibition of

1 having the position of deputy chief?
2   A. No.
3   Q. Did you ever tell anybody in writing or
4 verbally that you had an interaction with the agency
5 about finding a way around the prohibition of having
6 a deputy chief?
7   A. No, I didn't.
8   Q. Did you have an understanding from your
9 conversation with Mark Stankiewicz as to why there
10 could not be a position of deputy chief under the
11 Civil Service laws or regulations?
12   A. I believe that it had to go through the
13 state house and all sorts of legislation had to be
14 passed and stuff like that and then had to be
15 brought before town meeting.  So he suggested using
16 a different title.
17   Q. So it was Stankiewicz that told you it
18 would have to be a special law pass and then brought
19 before town meeting?
20   A. Yes.
21     MS. GREER:  Off the record.
22     (Off the record.)
23     (Ms. Cowin present.)
24 BY MS. GREER:

**41**

1   A. No, I never -- I was dumb-founded -- I
2 never received any complaints about any hostile work
3 environment.
4       Q. Did you ever hear during the fall of 2004
5 there were toy rats placed in certain officer's --
6       A. No.
7           MR. PFAFF: Let her finish.
8       Q. -- mail boxes?
9       A. No.
10      Q. Now, besides reassigning the lieutenants'
11 shifts, you also reassigned their work space,
12 correct, in December of 2004?
13      A. I believe Chris Ciampa assigned.
14      Q. You were apprised of the reassignment at
15 the least, were you not?
16      A. There was a space in time where Chris was
17 running the department and he would tell me about
18 changes and things that he did. And I would assume
19 I heard, yes.
20      Q. So you knew that the three lieutenants
21 were having their workspace reassigned in December
22 2004, correct?
23      A. I believe so.
24      Q. And it was with your approval, was it not?

**42**

1       A. Yes.
2       Q. And you knew they were being assigned to a
3 corner of the sergeant's office, correct?
4       A. No.  If you are referring to assignment,
5 that was just to move desks around.  I mean I would
6 assume that nobody was assigned to the sergeant's
7 office.  Each of them had an office.  So I don't
8 know where you got that sergeant's office.
9       Q. Weren't they all initially assigned to
10 move into the sergeant's office?
11      A. No, I don't think so, no.
12      Q. Wasn't that one of the issues raised by
13 Mark Stankiewicz as to rethinking the reassignment
14 of the lieutenants?
15      A. Mark Stankiewicz never came up to me about
16 any office assignments.  And no lieutenant spent
17 anytime in the sergeant's office.
18      Q. Wasn't Mike Blount initially moved in
19 there?
20      A. If he was, it was probably for a day or
21 two until his office was moved, until the desk
22 furniture was moved to another office, until his
23 files and computers and everything else.  There was
24 no officer, no lieutenant assigned anywhere else

**43**

1 except in the offices.  Not the sergeant's office.
2       Q. Wasn't the reason that Mike Blount was
3 ultimately moved because of concerns that he was
4 sharing office space with David Cohen against whom
5 he was testifying at the grand jury?
6       A. No.
7       Q. Wasn't that the reason he was ultimately
8 reassigned?
9       A. Chris Ciampa made those assignments.  I
10 believe I agreed with them.  They were streamlining.
11 He needed an office, so we had to move  somebody
12 into another office.  And Mike Blount had his own
13 office.  This was just an administrative move.
14          There were two officers, two lieutenants
15 in each office.  Each of them had a separate desk in
16 one office.  There were no putting in sergeant's
17 offices.
18          I needed space for Acting Chief Ciampa.
19 He was put in one office with Wohlgemuth.  And
20 Blount was moved into another office.
21      Q. So at that time Chris Ciampa wasn't the
22 acting chief, was he?
23      A. No.
24      Q. Do you remember having any discussions

**4**

1 with anybody about trying to move the lieutenants
2 closer to the dispatcher?
3       A. No.
4           MS. GREER: Let's take a minute
5 break.
6           (SHORT BREAK.)
7 BY MS. GREER:
8       Q. Now, when you were reinstated to the
9 position of chief in late November/early December
10 2004, didn't Mike Blount still have the assignment
11 of doing internal investigations at that point in
12 time?
13      A. He was only assigned one internal
14 investigation.  There was no stipulation that he was
15 internal affairs or anything.  He didn't have that
16 title because I could give an internal investigation
17 to any lieutenant or sergeant.
18      Q. But didn't he have the assignment of doing
19 internal investigations at that time?
20      A. No, I only assigned him one case.  It was
21 originally -- it was going to Wohlgemuth.
22      Q. Do you remember talking to Marc Terry --
23 first of all, do you know who Marc Terry is?
24      A. Can you refresh my memory?

EXHIBIT 4

# O'BRIEN &LEVINE

## Court Reporting Services



MAR 2 3 2006

**YOUR BOSTON CONNECTION...WORLDWIDE**

# Robert J. Welch v. Christopher Ciampa, et al.

**Transcript of the Testimony of:**

# Christopher Ciampa

# March 9, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Cindy M. Falcon  1-18048

Christopher Ciampa 5 9 2006
Robert J Welch v. Christopher Ciampa, et al

6

1    Q   Have you ever testified at a trial?
2    A   Yes.
3    Q   On how many occasions?
4    A   More than 30.
5    Q   All in your capacity as --
6    A   A police officer, yes.
7    Q   A police officer. So as you can see, there's a
8        court reporter here taking down everything that
9        we say. So just to make it easier for the court
10       reporter, try to give verbal responses instead
11       of nodding your head so the court reporter can
12       pick it up.
13          We will try not it talk over each other.
14       I'll try to let you finish all your answers and
15       in turn try to let me finish my questions before
16       answering.
17          If you don't understand anything, you can
18       ask me to repeat or rephrase any questions.
19       Also if your attorney makes any objections to my
20       questions, you can still go ahead and answer
21       unless he explicitly instructs you not to.
22          What is your address?
23   A   36 Duggan Street, D-U-G-G-A-N, Stoughton,
24       Massachusetts.

7

1    Q   What's your educational background?
2    A   I have a bachelor's degree in law enforcement
3        from Western New England College, and I have a
4        juris doctor from Suffolk University Law School.
5    Q   Other than your undergraduate and graduate
6        degrees, have you engaged in any other training?
7    A   Through the police department, yes.
8    Q   What types of training?
9    A   A great deal of training over the last 20
10       years. I've had training in police stress, I've
11       had training in street-level narcotics, I've had
12       training in -- I was a defensive tactics
13       instructor, patrol procedures instructor, and
14       our usual in-service training, and probably some
15       things that I'm forgetting.
16   Q   What is your current position?
17   A   I'm the acting chief of police.
18   Q   How long have you been acting chief?
19   A   About a year. It was last March 17 I was sworn
20       in.
21   Q   And previous to that, what was your position?
22   A   I was, immediately prior to that I was the
23       executive officer.
24   Q   How long were you executive officer?

8

1    A   From November to March of last year.
2    Q   And previous to executive officer?
3    A   I was a sergeant.
4    Q   When did you first start working at the
5        Stoughton Police Department?
6    A   1987.
7    Q   What position did you have when you came on?
8    A   Patrolman.
9    Q   How long were you a patrolman?
10   A   Until 1993.
11   Q   And then --
12   A   I was promoted to sergeant.
13   Q   And you had been sergeant until sometime in
14       2004?
15   A   Yes. Well, actually, I was -- my civil service
16       rank is still sergeant, but I've been appointed
17       acting police chief. I'm on leave of absence
18       from my civil service rank.
19   Q   And in the approximately 11 years that you were
20       a sergeant, did you ever take on a specialist
21       position?
22   A   I was the training officer.
23   Q   When were you training officer?
24   A   I want to say -- I'm not exactly sure of the

9

1        date, but it was probably 1995 or so.
2    Q   For how long were you training officer?
3    A   I believe two years.
4    Q   What special responsibilities did you have as
5        training officer?
6    A   I was responsible for all the training,
7        scheduling the training for the whole
8        department.
9           And when I was a training officer, I was
10       also a defensive tactics instructor, so I gave
11       some classes in different, you know,
12       handcuffing, things like that.
13   Q   Any other specialist positions that you served
14       on?
15   A   No.
16   Q   How about any other supervisory positions?
17   A   No.
18   Q   And how did it happen that you were appointed
19       training officer?
20   A   I applied for the position, and the chief of
21       police appointed me.
22   Q   Who was the chief at that time?
23   A   Phil Dineen.
24   Q   Phil, what's his last name?

3 (Pages 6 to 9)

Christopher Ciampa 3-9-2006
Robert J. Welch v. Christopher Ciampa, et al.

82

1 comfortable with having a lieutenant on every
2 shift.
3 Q   How about the way the shifts were assigned to
4     the different lieutenants?
5 A   Again, that's the chief's discretion.
6     Personally, I didn't like what was done and I
7     expressed that to Chief Cachopa, but I can
8     certainly understand that he wanted people close
9     to him that he could trust.
10        You know, he wanted people on the day shift
11     that he could trust, and he wanted, you know, I
12     can understand why he would make the choices
13     that he made.
14 Q   So he wouldn't want Mr. Wohlgemuth or Mr. Blount
15     on the day shift because he couldn't trust them?
16 A   Well, no.  As I said, the lieutenants -- the
17     reasoning I was given was that it was done on
18     the basis of seniority, the shift that they
19     picked.
20        Now, their responsibilities also were
21     changing in that they were going to become less
22     administrative and more just supervisors of the
23     shift.  So I mean, that was the motivation of
24     the moves or what I was told the motivation for

83

1 the moves was.
2 Q   You just testified that you told Mr. Cachopa
3     that you weren't happy with how the assignments
4     were made or how the changes were made?
5 A   No, it wasn't that I wasn't happy with it.
6     It's-- I was concerned that people would see it
7     as, you know, retribution.
8 Q   Did you see it as retribution?
9 A   No.
10 Q   Did you see it as partly retribution?
11 A   Honestly, I'm sure that that was a factor,
12     but -- I'll just leave it at that.
13 Q   What did Mr. Cachopa say when you said this
14     could be perceived as retribution?
15 A   I don't recall what he said.
16 Q   Do you recall the general nature of what he
17     said?
18 A   I mean, he felt that he had a legitimate reason
19     to do this and that he was going to do it.
20 Q   Other than the changes that we've just talked
21     about with the three lieutenants, during the
22     period that Mr. Cachopa was serving as chief,
23     were there any other changes to the positions of
24     Mr. Welch, Mr. Pascarelli, Mr. Lepro, or Mr.

84

1 Curtis?
2 A   No.  Oh, wait, I'm sorry.  Al Curtis I believe
3     was a juvenile officer at the time, and he was
4     removed from that position.  I think, again, I
5     don't know if that was done on July 1 or if it
6     was done midterm.
7 Q   And if it had been July 1, then that would have
8     been you who would have done it?
9 A   No, yeah, -- I'm a little confused now whether
10     Al Curtis was the juvenile officer at the time
11     or if -- I know that when he had been reinstated
12     as juvenile officer at one point and then taken
13     out at one point, and I'm not sure exactly when,
14     it was before I had become acting chief.
15 Q   And he was replaced by Bill Tracey?
16 A   Yes.
17 Q   And you think Mr. Cachopa made that decision?
18 A   Yes.
19 Q   But that would have been outside of the July 1
20     reappointment structure?
21 A   Yes.
22 Q   And was Bill Tracey one of the officers who
23     had-- strike that.
24        You stated earlier that Mr. Tracey was one

85

1 of the officers who had been involved in the
2 recall campaign; is that correct?
3 A   Yes.
4 Q   Did you discuss with Mr. Cachopa the decision to
5     remove Mr. Curtis from the juvenile officer
6     position?
7 A   You know, I don't recall having any discussions
8     about that.
9        I know that Al Curtis was not a good
10     juvenile officer, and we were surprised when he
11     was reinstated to the position because there had
12     been many, many complaints from the school and
13     from parents and from other officers from him not
14     following up on things.
15        So when -- I think it was Lieutenant
16     Chamberlin, when he was the acting chief -- I'm
17     dealing with a string of chiefs here, so I
18     believe it was him that reappointed Al Curtis as
19     the juvenile officer.
20 Q   On July 1, '04?
21 A   Again, the dates, I don't know.
22 Q   Okay.  I don't want to go into too much detail
23     on this.  I just want to be clear.
24        So Al Curtis was the juvenile officer in

22 (Pages 82 to 85)

EXHIBIT 5

**Christopher Ciampa**
**July 29, 2008**

U.S. DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MICHAEL BLOUNT,                    \*

       Plaintiff,         \*

v.                                 \*    CIVIL ACTION NO.

TOWN OF STOUGHTON,                 \*    06-11504-RCL

MANUEL CACHOPA and                 \*

CHRISTOPHER CIAMPA,                \*

      Defendants.        \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF:  CHRISTOPHER CIAMPA

LAW OFFICE OF LESLIE B. GREER

875 Massachusetts Avenue, Suite 31

Cambridge, Massachusetts

July 29, 2008     10:13 a.m.


Elaine Hurley

Court Reporter

# Christopher Ciampa
## July 29, 2008

### Page 62

1    MS. GREER: I agree. Let's see if we can
2  rephrase it and break it down a little bit.
3    Q.  Do you know if the officers who were
4  reinstated were told not to harass or intimidate
5  people who were to be witnesses before the Grand
6  Jury?
7    A.  I didn't know that at the time, but since
8  I've seen a letter from the town manager that
9  reinstated them with those stipulations, to not get
10  involved.
11    Q.  You did not attend a meeting on November
12  15th at town hall?
13    A.  No.
14    Q.  Apart from yourself, did you have an
15  understanding at that time as to who the Grand Jury
16  witnesses were?
17    A.  No.
18    Q.  Do you have any understanding that Mike
19  Blount was likely to be a witness since he was
20  involved in the Timothy Hills' investigation?
21    A.  Like I said, what we heard was rumors. I
22  didn't know who was involved. I didn't know who
23  the witnesses were. I didn't really know much of
24  anything that was going on.

### Page 63

1    Q.  What do you know about a press conference
2  called by Chief Saccardo on or about November 19,
3  2004?
4    MS. COWIN: Objection.
5    MR. PFAFF: What did you call it?
6    MS. GREER: Press conference.
7    MS. COWIN: Wrong date.
8    MS. GREER: I'm sorry? Wrong date?
9    MS. COWIN: Clarification of the date?
10    MS. GREER: You don't think it was
11  November 19, 2004?
12    MS. COWIN: I guess you can ask the
13  witness.
14    Q.  Do you remember Saccardo holding a press
15  conference after the recall election?
16    A.  I heard about it. I wasn't present.
17    Q.  Did you ever see any tapes of it?
18    A.  I saw it on the news actually.
19    Q.  That occurred after the recall election,
20  correct?
21    A.  I believe so. More than likely, yeah.
22    Q.  Do you remember Mike Blount and the other
23  two lieutenants standing behind Saccardo?
24    A.  I did see him standing behind him, yes.

### Page 64

1    Q.  Did you view that as indicative that
2  Blount and the other two lieutenants were
3  supporting Saccardo?
4    A.  Yes.
5    Q.  At that press conference — I realize
6  this is not quite four years ago, but what's your
7  best recollection as to what Saccardo said at the
8  press conference or the purpose of the press
9  conference?
10    A.  I don't know what his purpose of the
11  press conference was. I do recall him saying
12  something about unstable officers running around
13  with guns. That's what sticks out in my mind.
14    Q.  Was he referring to the officers who were
15  being reinstated?
16    A.  I don't know who he was referring to. He
17  never took time to meet any of the officers that
18  worked under him. I would imagine that that's who
19  he was referring to.
20    Q.  Well, that was your understanding at the
21  time, right?
22    A.  Yeah.
23    Q.  Prior to November of 2004 — strike that.
24    Between July 1, 2004 and November 2004,

### Page 65

1  did you have any conversations with Manny Cachopa
2  about the management of the police department?
3    A.  I don't recall to be honest with you. I
4  may have.
5    Q.  Did you have any discussions with Cachopa
6  about if he was reinstated he would appoint you to
7  be second in command of the department?
8    A.  He mentioned that to me.
9    Q.  When did that occur?
10    A.  I don't remember when.
11    Q.  Was it prior to the recall election?
12    A.  Yes.
13    Q.  Apart from him indicating to you that he
14  would appoint you to be second in command of the
15  department, do you remember having any other
16  conversations with him relative to the management
17  of the department?
18    A.  No.
19    Q.  After Manny Cachopa was reinstated as
20  chief, did you have discussions with him at that
21  point about management of the department?
22    A.  Almost on a daily basis, yeah.
23    Q.  Do you remember having discussions with
24  him about you being appointed as deputy chief?

17 (Pages 62 to 65)

# Christopher Ciampa
## July 29, 2008

|  | Page 82 |
|---|---|
| 1 | Chamberlin were on the 8:00 to 4:00 shift, and |
| 2 | Lieutenant Wohlgemuth was on the 4:00 to 12:00 |
| 3 | shift. |
| 4 | **Q.  Did he make any other changes in terms of** |
| 5 | **the lieutenants?** |
| 6 | A.  With regard to? |
| 7 | **Q.  Did he change where they were to work?** |
| 8 | A.  Yes. |
| 9 | **Q.  What were the changes that he made?** |
| 10 | A.  Well, I needed office space as the |
| 11 | executive officer.  At that time there were three |
| 12 | lieutenants in a two-person office, so office space |
| 13 | needed to be moved around.  The lieutenants were |
| 14 | put in the sergeants' office temporarily, and then |
| 15 | I moved into the lieutenants' office.  I ended up |
| 16 | sharing that office with Lieutenant Wohlgemuth. |
| 17 | Eventually Lieutenant Blount was moved in the |
| 18 | juvenile office.  The juvenile officers who had an |
| 19 | office of a similar size were moved into basically |
| 20 | a closet and Lieutenant Blount was moved into the |
| 21 | second office. |
| 22 | **Q.  Did Wohlgemuth ever actually move out of** |
| 23 | **the lieutenants' office?** |
| 24 | A.  No. |

|  | Page 83 |
|---|---|
| 1 | **Q.  When these changes were made, did you** |
| 2 | **have a conversation with the Town Manager** |
| 3 | **Stankiewicz about it?** |
| 4 | A.  Did I? |
| 5 | **Q.  Yes.** |
| 6 | A.  No. |
| 7 | **Q.  Were you present when Cachopa had a** |
| 8 | **conversation with the town manager about it?** |
| 9 | A.  I don't recall being present for it. |
| 10 | **Q.  Did it come to your attention that the** |
| 11 | **town manager had warned Cachopa that the changes** |
| 12 | **might be viewed as retaliatory?** |
| 13 | MS. COWIN: Objection. |
| 14 | A.  Can you say that again? |
| 15 | **Q.  Did it come to your attention that the** |
| 16 | **town manager stated that the changes might be** |
| 17 | **viewed as retaliatory?** |
| 18 | MS. COWIN: Objection. |
| 19 | A.  It may have. |
| 20 | **Q.  Did you have a conversation with Manny** |
| 21 | **Cachopa and indicate to him that people could see** |
| 22 | **it as a retribution?** |
| 23 | A.  I don't recall. |
| 24 | **Q.  Did you see it partly as a retribution** |

|  | Page 84 |
|---|---|
| 1 | against the lieutenants? |
| 2 | A.  No.  I saw it as a problem with office |
| 3 | space. |
| 4 | **Q.  Why don't you flip over to page 83 of the** |
| 5 | **transcript, which is page 22 of the mini** |
| 6 | **transcript.  I'm going to direct your attention to** |
| 7 | **line 8 of page 83 and ask you to read that.** |
| 8 | A.  I'm sorry.  Which line? |
| 9 | **Q.  The question starting at line 8 of page** |
| 10 | **83.  Just read that to yourself for a minute.** |
| 11 | A.  (Witness complying) |
| 12 | **Q.  Is it fair to say that at least at some** |
| 13 | **point you viewed the changes at least as partly as** |
| 14 | **retribution against the lieutenants?** |
| 15 | A.  As I said, I'm sure there was some of |
| 16 | that, you know, a small factor involved.  As I |
| 17 | said, I think the main reason was an office space |
| 18 | problem. |
| 19 | **Q.  Did you ever have any discussions with** |
| 20 | **Manny Cachopa about whether his changes might have** |
| 21 | **created any possible liability under the** |
| 22 | **Whistleblower's Statute?** |
| 23 | A.  Not that I can recall. |
| 24 | **Q.  Are you familiar with what is commonly** |

|  | Page 85 |
|---|---|
| 1 | referred to as the Whistleblower's Statute in |
| 2 | Massachusetts? |
| 3 | A.  Yes. |
| 4 | **Q.  Your role with respect to the changes** |
| 5 | **that were decided by Cachopa was to implement the** |
| 6 | **changes?** |
| 7 | A.  Yes. |
| 8 | **Q.  Despite your concern or feeling that they** |
| 9 | **might be partly based on retribution, did you go** |
| 10 | **ahead and implement those changes?** |
| 11 | MS. COWIN: Objection. |
| 12 | A.  Yes. |
| 13 | **Q.  Let's go back to the office relocation.** |
| 14 | **You indicated that Wohlgemuth never moved out of** |
| 15 | **the office, right?** |
| 16 | A.  No. |
| 17 | **Q.  Did Chamberlin ever move into the** |
| 18 | **sergeant's office?** |
| 19 | A.  Chamberlin wasn't there at the time.  He |
| 20 | went out sick when Manny Cachopa was reinstated. |
| 21 | His things were eventually moved into there, and |
| 22 | when we cleared the juvenile guys out of that |
| 23 | second office, Chamberlin's desk was moved in there |
| 24 | along with Lieutenant Blount's desk and file |

22  (Pages 82 to 85)

## CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, MA

822b5bb2-147a-4dda-aac2-f1fe93c4a69a

**Christopher Ciampa**
**July 29, 2008**

---

**Page 90**

1    A. I know that internal investigations were
2  given to me to do.
3    Q. Before Cachopa changed the internal
4  investigation assignment to you, were they formerly
5  done by Blount and Wohlgemuth?
6    A. I believe so, yes.
7    Q. Did Wohlgemuth previously have the
8  ability to suspend?
9    A. Yes.
10    Q. Was that taken away from him?
11    A. Yes.
12    Q. Also were the training locations for the
13  lieutenants changed?
14    A. Yes, they were. The training that they
15  were attending didn't have -- there's a new
16  training since 9/11. It's called NIMS training.
17  It's national training so that everyone's on the
18  same page in case of an emergency. The training
19  that they were attending didn't offer that training
20  so they were sent to the same training as everybody
21  else.
22    Q. I'm sorry. Did you call it MIMS
23  training?
24    A. NIMS, National Incident Management

---

**Page 91**

1  Service.
2    Q. When was that instituted?
3    A. It was instituted -- it's been instituted
4  in several different forms since 9/11. The latest
5  version of it is called NIMS. That was instituted
6  probably 2004. I would say in 2004 the federal
7  government came out with a mandate that everybody
8  would be trained in the same program.
9    Q. During the time that you were acting
10  chief, did you continue to have one lieutenant
11  assigned to each shift?
12    A. Yes.
13    Q. Devine became a lieutenant during the
14  time that you were acting chief, correct?
15    A. Correct.
16    Q. And he was not assigned to the 12:00 to
17  8:00 shift, was he?
18    A. No, he wasn't.
19    Q. Blount continued on the 12:00 to 8:00
20  shift, right?
21    A. Yes, he did.
22    Q. Was there some reason that you decided
23  not to have shift assignments not done on the basis
24  of seniority when you were acting chief?

---

**Page 92**

1    A. Yes.
2    Q. What was that?
3    A. Lieutenant Devine was in charge of all my
4  community policing programs so most of the business
5  that he did, the meetings he attended were during
6  the day because that's when everybody works. It
7  made more sense to have him on the day shift so
8  that he could attend these meetings and not cost me
9  overtime.
10      If I had put him on midnights, then all
11  the meetings — he's a member of a group called
12  OASIS, which is the Organization Against Substance
13  Abuse in Stoughton. He directs all the community
14  policing programs, which means he's in contact with
15  businesses on a regular basis and civilian groups.
16  All those things that he's involved in, I would
17  have had to pay overtime for so I put him on day
18  shift to save myself some money.
19    Q. In addition to the changes that were made
20  to the lieutenants' assignments, were there also
21  changes made to other officers in the department?
22    A. I don't understand.
23    Q. Yourself, you were formerly a sergeant,
24  and then you became the executive officer, correct?

---

**Page 93**

1    A. Right. Sergeant Murphy was appointed
2  executive officer, if that's what you're getting
3  at.
4    Q. No. We're just talking at this point
5  about when Cachopa was reinstated?
6    A. I thought you said after I was acting
7  chief.
8    Q. I'm sorry. I might have misspoke. When
9  Cachopa was reinstated were there changes made to
10  the assignments of other officers?
11    A. Do you have specific names? I believe
12  Craig Lepro was eventually removed from the
13  detectives.
14    Q. He was known not to support the
15  reinstatement of Cachopa, wasn't he?
16      MS. McCORMACK: Objection.
17    A. That actually came as a request from
18  Detective Sergeant Walsh who had asked that he be
19  removed a year earlier. He didn't do a good job.
20  He wasn't a good detective.
21    Q. But he had not been removed a year
22  earlier, had he?
23    A. No.
24    Q. But he was removed after Cachopa was

---

24 (Pages 90 to 93)

# Christopher Ciampa
## July 29, 2008

**Page 98**

1 not to reappoint Bobby Welch as detective sergeant?

2    A. Yes.

3    Q. When that occurred, did the town manager

4 warn you that it might be viewed as retribution?

5    A. Yes.

6    Q. But you went ahead and moved Welch

7 anyway?

8    A. I did.

9    Q. You indicated that after Cachopa was

10 reinstated you were assigned the responsibility of

11 doing internal investigations. Had you ever done

12 any internal investigations prior to December of

13 2004?

14    A. No.

15    Q. Had you ever had any non-on-the-job

16 training specifically to learn about how to do

17 internal investigations prior to December of 2000?

18    A. Yes.

19    Q. When did that occur?

20    A. I don't recall the date. I attended a

21 school with Manny Cachopa regarding internal

22 investigations and civil service, dealing with

23 civil service issues. So it probably would have

24 been right after Manny was reinstated. So it would

**Page 99**

1 actually be after November of 2004.

2    Q. Do you recall the first internal

3 investigation that you were assigned to conduct?

4    A. Do I recall it?

5    Q. Yes.

6    A. Yeah.

7    Q. What was it?

8    A. It was regarding an allegation that Mike

9 Blount made that Manny Cachopa attempted to run him

10 down in the town hall parking lot.

11    Q. Cachopa assigned you to do that

12 investigation after he appointed you as executive

13 officer?

14    A. Yes.

15    MS. GREER: This will be Ciampa 3.

16

17    (Exhibit 3, Report of Investigation of

18    Complaint of Michael Blount, marked)

19

20    Q. (By Ms. Greer) Is that the report that

21 you wrote after completing the internal

22 investigation of Mike Blount?

23    A. Yes.

24    Q. For Manny Cachopa?

**Page 100**

1    A. The investigation of -- yes. I'm sorry.

2 It was the investigation of the allegation of

3 assault by Mike Blount.

4    Q. Did you complete this investigation

5 before or after you had taken the training into how

6 to conduct internal investigations?

7    A. I would probably say that it was before.

8    Q. Look at the date on the back, the last

9 page.

10    A. I would probably say it was before.

11    Q. What is the usual procedure for doing

12 internal investigations as you now understand it?

13    MS. McCORMACK: Do you mean sitting here

14 today, or are you referring to at this time?

15    Q. As you now understand it.

16    A. It depends on the investigation. There's

17 no one way to do any kind of an investigation. It

18 depends on the circumstances. An investigation of

19 this type you would speak to all the witnesses.

20 You would get a statement from the individual

21 you're investigating, gather your facts and write

22 your report and make your recommendation.

23    Q. During your investigation did you talk to

24 Mike Blount about what had occurred in the parking

**Page 101**

1 lot?

2    A. No, because I had his written statement

3 that he had prepared. This is actually not a

4 complete report. The report that I wrote had

5 attachments and one of the attachments was Michael

6 Blount's written statement.

7    MS. GREER: Can we mark this Exhibit 4.

8

9    (Exhibit 4, Letter to Chief Saccardo from

10    Lieutenant Blount, marked)

11

12    Q. (By Ms. Greer) Is that the "witness

13 statement" that you're referring to?

14    A. Yes.

15    Q. Apart from reading this, did you make any

16 attempt to talk to Mike Blount in person about what

17 had occurred?

18    A. No.

19    Q. From reading this did you understand that

20 there was another witness who had been present in

21 the parking lot talking to Mike Blount immediately

22 before Manny Cachopa drove in?

23    A. David Tonis, yes.

24    Q. Did you talk to Tonis?

26 (Pages 98 to 101)

## CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION
### Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, MA

822b5bb2-147a-4dda-aac2-f1fe93c4a69a

# Christopher Ciampa
## July 29, 2008

### Page 102

1    A.  Yes, I did.

2    Q.  When did you talk to David Tonis?

3    A.  I don't recall the exact date.

4    Q.  In your report about the internal

5  investigation you mention on page 1, referring to

6  Exhibit 3 here, that you did an interview with

7  Manuel Cachopa, correct?

8    A.  Yes.

9    Q.  And you indicated that you did an

10  interview with Thomas Rorrie, correct?

11    A.  Yes.

12    Q.  And you indicate that you did an

13  interview with Theresa Cardoso, correct?

14    A.  Correct.

15    Q.  And you did an interview with Joseph

16  Krowski, correct?

17    A.  Correct.

18    Q.  Is there any mention in there that you

19  talked to Dave Tonis?

20    A.  No.

21    Q.  When you talked to Dave Tonis, what did

22  he tell you?

23    A.  That he really didn't see anything. He

24  had a conversation with Mike Blount and they parted

### Page 103

1  ways, walked away. That was basically all he told

2  me.

3    Q.  Did he indicate to you that he heard a

4  screech of tires?

5    A.  Yes, he did indicate that.

6    Q.  And you did not include that in your

7  report, did you?

8    A.  No.

9    Q.  You did not include in your report any

10  statement from Dave Tonis, did you?

11    A.  No.

12    Q.  What do you know about an incident when

13  Cachopa pulled a gun on another officer?

14    MS. McCORMACK:  Objection.

15    MS. COWIN:  Objection.

16    A.  I heard rumors is all I heard. I don't

17  know anything specifically about it.

18    Q.  What do you know? You heard a rumor that

19  he pulled a gun on someone?

20    MS. COWIN:  Objection.

21    A.  That's all I heard.

22    Q.  What do you know about an incident

23  involving Wohlgemuth and Cachopa in a parking lot?

24    MS. McCORMACK:  Objection.

### Page 104

1    A.  The only thing I know is what I heard

2  well after the fact.

3    Q.  What did you hear?

4    A.  Wohlgemuth accused Cachopa of staring at

5  him in the parking.

6    Q.  In Mike Blount's, what you called

7  "witness statement", did he mention staring?

8  Directing your attention to the second page, bottom

9  of the first paragraph about four lines up. Does

10  his account of what transpired there mimic what you

11  heard about the Wohlgemuth/Cachopa parking lot

12  incident?

13    A.  At the time I hadn't heard of any

14  incident with Wohlgemuth and Cachopa. What it says

15  is that Manny Cachopa stared at him for

16  approximately 30 seconds, which is kind of

17  unbelievable that somebody would get into a staring

18  contest for 30 seconds. That's quite a long period

19  of time. Particularly, when all the other

20  witnesses say that Mike Blount never broke stride

21  in the parking lot. Does that answer your

22  question?

23    Q.  I'm going to direct your attention to the

24  bottom of the page. Read the last paragraph there.

### Page 105

1    A.  "I recommend that Lieutenant Cachopa be

2  suspended from duty immediately, be prosecuted

3  criminally for the offenses and then sanctioned in

4  a manner commensurate with same."

5    Q.  Do you view this to be a complaint on the

6  part of Blount?

7    A.  Yes.

8    Q.  When people come into the police station

9  — strike that.

10    When you were a police officer and people

11  would come into the police station and make a

12  complaint, apart from simply making a complaint,

13  would they also be separately interviewed?

14    A.  Yes.

15    Q.  Did you do that with Mike Blount?

16    A.  No, because I had his statement. At this

17  point Mike Blount wasn't the complainant. He took

18  this — this is a police report and he took this to

19  the District Attorney's office. The District

20  Attorney sent a state police officer to conduct an

21  investigation and these charges were not added to

22  Chief Cachopa's indictment, which further tells me

23  that there was nothing to his complaint.

24    Q.  Are you referring to a state police

27  (Pages 102 to 105)

**Christopher Ciampa**
**July 29, 2008**

---

Page 110

1  recall. As I said, it's been a while since I've
2  read it.
3     Q.  In early 2005, did you send a letter to
4  Mike Blount directing him to give an account of
5  missing 911 tapes?
6     A.  Yes.  I gave a letter to Lieutenant
7  Blount, Lieutenant Wohlgemuth, Lieutenant
8  Chamberlin and Joseph Saccardo.  I mailed one to
9  Joseph Saccardo as well.
10    Q.  What was your understanding as to how the
11 911 tapes went missing?
12    A.  Brian Holmes, one of the officers that
13 was put out on administrative leave, was in charge
14 of the 911 tapes.  When he was put out on leave, he
15 took the box of the tapes that he had in his
16 control and was going to turn them over to whomever
17 was in charge.  He tried to see the lieutenants and
18 they were in a closed-door meeting with Joe
19 Saccardo.  He left the tapes with Mary Daley
20 DiCastro, the chief's assistant, and he left the
21 building.  He turned in his things and left the
22 building.
23    Joe Saccardo was chief for three weeks or
24 whatever it was.  Manny Cachopa was reinstated.

---

Page 111

1  Shortly thereafter we got a call from the District
2  Attorney's office looking for a copy of one of the
3  911 tapes.  We couldn't locate the tapes.  We tried
4  to find out who had them.  We went to Brian Holmes
5  first naturally and he told us what had happened,
6  that he left the tapes with Mary.  The next logical
7  step was to talk to the people who were in charge
8  of the police department at the time to see if they
9  knew where the tapes were.
10    Q.  Did you talk to Mary first?
11    A.  Yes.
12    Q.  What did she say?
13    A.  She recalled him dropping the tapes off,
14 but other than that she had no recollection of what
15 happened to them.
16    Q.  Apart from the fact that Mike Blount was
17 a lieutenant and in a meeting with the chief and
18 other lieutenants, did you have any reason to think
19 that he would know anything about those tapes?
20    A.  He may very well had.  At the time the
21 department was being run by Joe Saccardo, David
22 Chamberlin, Mike Blount and Franny Wohlgemuth.  The
23 assumption was that one of those four people would
24 know something about where those tapes went.  So I

---

Page 112

1  asked all four.
2     Q.  When you say Mike Blount and the other
3  two lieutenants were running the department with
4  Saccardo, am I correct in understanding that is
5  because they were superior officers that they were
6  running the department?
7     A.  Joe Saccardo was the chief and his
8  command staff is the people who are immediately
9  under him, who were the three lieutenants.
10    Q.  Did you ever tell anyone that Holmes had
11 turned the tapes over to David Chamberlin?
12    A.  The story that I got from Brian Holmes is
13 that he attempted to turn them over to David
14 Chamberlin.  David Chamberlin was in that meeting,
15 and he left the tapes with Mary.
16    Q.  That's a little different from the
17 question I asked.  My question is did you ever tell
18 anyone that Holmes had turned the tapes over to
19 Chamberlin?
20    A.  I may have because that's what he
21 attempted to do.
22    Q.  The copy on this is not terrific, but
23 take a look at — do you remember testifying at a
24 deposition in the action brought by Wohlgemuth and

---

Page 113

1  Chamberlin?
2     A.  Yes.
3     Q.  Take a look at page 105 on the
4  miniscript.  Directing your attention to —
5     A.  Line 8 and 9?
6     Q.  Page 105, line 19 is what I have here.
7  No, it's up further.
8     A.  Line 8 and 9?
9     Q.  Yes, 8 and 9.
10    A.  Okay.
11    Q.  Is it fair to say that at some point you
12 testified that Holmes had turned the tapes over to
13 Chamberlin?
14    A.  Yes.
15    Q.  When you were acting chief, how many
16 times did you attempt to have Mike Blount
17 terminated from the police department?
18    A.  I can't terminate anyone from the police
19 department.  I can recommend termination.
20    Q.  The question was how many times did you
21 attempt to have him terminated?
22    A.  I believe twice.
23    Q.  What were those two occasions?
24    A.  The first was filing a false police

---

29  (Pages 110 to 113)

**CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, MA**

822b5bb2-147a-4dda-aac2-f1fe93c4a69a

# Christopher Ciampa
## July 29, 2008

### Page 122

1 Blount terminated?
2    A. I don't recall the date honestly. I
3 would have to say in 2006 probably.
4    Q. Was that shortly before David Cohen's
5 trial?
6    A. I don't recall when it was in relation to
7 the trial.
8    Q. Did you have a conversation with the town
9 manager when you requested that Blount be
10 terminated for filing two false police reports and
11 being out of town when he was supposed to be on
12 duty?
13    A. Yes.
14    Q. What did you say to him and what did he
15 say to you?
16    A. We had many emails and conversations.
17 Basically, his stance was that Mike Blount was not
18 to be touched under any circumstances no matter
19 what he did. My argument was that he's shown a
20 pattern of incompetent behavior over the course of
21 his entire career, which is now full blown. Now
22 that he's a lieutenant, he seems to be just running
23 amuck, and he should be disciplined just like
24 anyone else would be disciplined. As I said to

### Page 123

1 Stankiewicz and I'll say it here, if I had done the
2 things that Mike Blount had done, I would be
3 unemployed.
4    However, the town manager, who is the
5 appointing authority and doles out discipline,
6 decided that nothing would be done.
7    Q. During the 20 years that you were on the
8 Stoughton Police Department, how many other black
9 police lieutenants served?
10    A. None.
11    Q. How many other black sergeants serviced?
12    A. Just Lieutenant Blount, Sergeant Blount
13 at the time.
14    Q. You said that apart from those two
15 occasions that you attempted to have Blount
16 terminated, were there any other occasions that you
17 attempted to have Blount terminated?
18    A. Terminated?
19    Q. Terminated.
20    A. No.
21    Q. Were there occasions in which you
22 attempted to have Blount suspended for more than
23 five days?
24    A. For more than five days?

### Page 124

1    Q. Yes.
2    A. No.
3    Q. Were there occasions in which you
4 attempted to have Blount suspended for less than
5 five days?
6    A. Yes.
7    Q. What were those occasions?
8    A. On one occasion he worked a double shift,
9 a 4:00 to 12:00 and a 12:00 to 8:00 shift. During
10 the 4:00 to 12:00 shift he conducted an illegal
11 search and seizure, coerced somebody into allowing
12 him to search the car by threatening to have it
13 towed. The individual didn't agree to have his car
14 searched until the tow truck pulled into the
15 parking lot.
16    Later on in that shift and early on into
17 the midnight to 8:00 shift he took control of a
18 domestic disturbance in which — to make a long
19 story short, there were two trips to the hospital
20 and about six dealings with the individuals before
21 a sergeant stepped in and actually made an arrest.
22    Q. When did that occur?
23    A. That would have been earlier this year or
24 late 2007, early 2008.

### Page 125

1    Q. For how long were you seeking to have
2 Blount suspended?
3    A. One day. I think it was one day.
4    Q. What happened?
5    A. I was overturned by the town manager.
6    Q. That would have been on an appeal of the
7 attempt to discipline to the town manager?
8    A. Yes.
9    Q. Did you attempt to have Blount suspended
10 for less than five days on any other occasions?
11    A. Not that I can recall.
12    Q. Apart from terminations and suspensions,
13 what other levels of discipline are there?
14    A. Written warnings — well, verbal
15 warnings, written warnings, suspensions and
16 termination.
17    Q. We've addressed the suspensions and
18 terminations. How many written warnings did you
19 give Mike Blount during the time you were acting
20 chief?
21    A. I'm really not sure to be honest with
22 you.
23    Q. Was it more than one?
24    A. I don't know. Honestly, I don't know.

32 (Pages 122 to 125)

**CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, MA**

822b5bb2-147a-4dda-aac2-f1fe93c4a69a

# Christopher Ciampa
# July 29, 2008

---

### Page 126

1  Q. How many verbal warnings did you give to
2  Mike Blount while you were acting chief?
3  A. None that I can recall.
4  Q. Let me ask you this: Do you remember
5  giving Mike Blount any written warnings during the
6  time that you were acting chief?
7  A. I think I have on a couple of occasions.
8  Again, I'm not sure.
9  Q. Do you recollect what those occasions
10  were?
11  A. No. You got to understand that every
12  time that there's an issue with Mike Blount you
13  usually get a four-page letter. So there's a lot
14  of correspondence back and forth. He has a
15  tendency to overreact to everything. If you ask
16  him a question, you get a four-page letter in
17  return. So there was a lot of corresponding back
18  and forth. It kind of all runs together.
19  Q. Am I to understand that you think that
20  you then did give Mike Blount written warnings?
21  A. Again, you can keep asking. I don't
22  recall. I really don't recall.
23  Q. Do you recollect attempting to have
24  anybody else terminated during the time you were

### Page 127

1  acting chief?
2  A. Yes.
3  Q. Who else did you attempt to have
4  terminated?
5  A. Brian Smith.
6  Q. Why did you attempt to have Brian Smith
7  terminated?
8  A. He was involved in a domestic dispute
9  with his wife off duty. He was arrested by the
10  Bridgewater Police and the town manager asked me if
11  I wanted him back. I said not if he's found
12  culpable in this, I don't want him back. I would
13  want him terminated.
14  Q. Was he convicted of domestic abuse?
15  A. The charges were dropped.
16  Q. Was he reinstated?
17  A. He was.
18  Q. Did you attempt to have anybody else
19  suspended during the time you were acting chief?
20  A. Yes.
21  Q. Who else did you attempt to have
22  suspended?
23  A. I suspended Joseph DeSousa, Stuart
24  Mellyn, Susan Walsh, Michael Doyle.

### Page 128

1  Q. Can you spell Lyn?
2  A. Mellyn, M-e-l-l-y-n.
3  Q. You suspended DeSousa, Walsh, Doyle and
4  Mellyn?
5  A. Yes.
6  Q. Do you recollect how long DeSousa was
7  suspended for?
8  A. One day.
9  Q. And how about Walsh?
10  A. Three days.
11  Q. How about Doyle?
12  A. One day.
13  Q. And how about Mellyn?
14  A. One day.
15  Q. Why was DeSousa suspended?
16  A. For insubordination.
17  Q. How about Walsh?
18  A. The other three were abusive sick time.
19  Q. Do you recollect giving written warnings
20  to other officers during your time as acting chief?
21  A. I've given written warnings to officers,
22  yes.
23  Q. To whom do you remember giving written
24  warnings while acting chief?

### Page 129

1  A. I believe those four officers received
2  them.
3  Q. Prior to being suspended?
4  A. Yes.
5  Q. Ultimately were —
6  MS. McCORMACK: Were you done?
7  A. Yeah. I'm sure there were others, but I
8  don't recall.
9  Q. Were Walsh, Doyle and Mellyn given
10  written warning about abusive sick time?
11  A. Yes.
12  Q. Were there continuing problems and they
13  were ultimately suspended?
14  A. Yes.
15  Q. How about DeSousa, was he given a written
16  warning about insubordination?
17  A. I don't believe he was. I think this was
18  a case where he had reports that hadn't been done,
19  completed for quite a while. He had been given
20  opportunities after opportunities to complete them.
21  He was actually put on the desk for a while so he
22  could complete his reports. After two or three
23  months, he didn't finish them and he was suspended.
24  Q. You mentioned a few minutes ago that one

## CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, MA

822b5bb2-147a-4dda-aac2-f1fe93c4a69a

EXHIBIT 6

**Thomas Murphy**
**July 30, 2008**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 06-11504-RCL

* * * * * * * * * * * * * * * * * * * * * * *

MICHAEL BLOUNT,                                        *

      Plaintiff,                                   *

      vs.                                          *

TOWN OF STOUGHTON, MANUEL CACHOPA, AND                 *

CHRISTOPHER CIAMPA,                                    *

      Defendants.                                  *

* * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:  THOMAS J. MURPHY, JR.

LAW OFFICE OF LESLIE B. GREER

875 Massachusetts Avenue, Suite 31

Cambridge, Massachusetts 02139

July 30, 2008          a.m. - a.m.

KATHRYN K. GIANNO

COURT REPORTER

**Thomas Murphy**
**July 30, 2008**

---

Page 6

1    Q.  What are your job responsibilities as
2  acting chief?
3    A.  I am the overseer of the operations of the
4  police department.
5    Q.  What does that entail?
6    A.  Everything from budgeting to scheduling,
7  assignments, disciplinary action.
8    Q.  Have your job responsibilities changed in
9  the time you've been working for the police
10  department?
11    A.  They have.
12    Q.  When did you first go to work for the
13  Stoughton police?
14    A.  September 1988.
15    Q.  Can you briefly describe, starting back in
16  1988, what your job responsibilities were and when
17  they changed and in what respect they changed?
18    A.  September of '88 I was employed as a
19  graduate from the academy in Plymouth and as a
20  patrol officer and all the daily routines of a
21  patrol office, whether it be patrolling traffic
22  enforcement.
23        I was promoted in May of 1997 to a
24  sergeant's position overseeing the midnight to eight

---

Page 8

1    Q.  Have you ever testified at civil trial
2  before?
3    A.  I don't recall.
4    Q.  Can you briefly describe your educational
5  background?
6    A.  I have a bachelor's degree from
7  Bridgewater State College in Criminal Justice, 1987.
8    Q.  And prior to going to work for the
9  Stoughton Police Department, can you give a brief
10  history of your former employment history?
11    A.  I was a corrections officer in '82 to '85;
12  during the transition, I was a substitute teacher
13  and a summer school teacher until 1988 when I was
14  employed by the Stoughton Police Department; and
15  I've been employed since with the Stoughton Police
16  Department with no interruption in service.
17    Q.  Have you ever been assigned to the same
18  shift as Mike Blount?
19    A.  Briefly, I believe we were on the day
20  shift together.
21    Q.  Approximately when that was?
22    A.  Approximately three or four years back.
23    Q.  Now, you said that in 2005 you became an
24  acting lieutenant due to a retirement.  Was that the

---

Page 7

1  shift and some years later, the day shift.  In '95,
2  I believe, May -- well, before that, in early '95 I
3  was promoted to acting lieutenant.
4    Q.  You said in 1997 you were promoted to
5  sergeant?  Do you mean --
6    A.  Excuse me 1997 sergeant, 2005 to an acting
7  lieutenant's position due to retirement.  And in May
8  of 2005, I was given the responsibilities of
9  executive officer overseeing everything other than
10  the chief.  And as recently as July 1, I was
11  promoted to the acting chief's position due to a
12  retirement.
13    Q.  Now, you've been deposed how many times
14  before?
15    A.  You know, at least once.  I don't recall
16  the number of times.
17    Q.  How many times have you testified before?
18    A.  In what fashion?  Many times I've
19  testified.
20    Q.  More than ten?
21    A.  Yes.
22    Q.  And have most of those occasions been in
23  connection with your work as a policeman?
24    A.  Yes.

---

Page 9

1  retirement of David Chamberlin?
2    A.  I believe so.
3    Q.  What does it mean to be an acting
4  lieutenant as opposed to a plain lieutenant?
5    A.  It was a matter of signing a list in May
6  of 2004, and for whatever reason, not being
7  promoted.  So that continued into the years now
8  until the list was revoked.  So I was in an acting
9  position waiting for promotion to be filled as a
10  permanent civil service job, and that never
11  happened; the list was revoked, a new test was
12  called for.
13    Q.  If you signed the list in 2004, isn't the
14  list normally good for two or three years?
15    A.  No.  I was signing the list to be
16  considered for the position, and I believe that has
17  to be sent back into civil service within 12 weeks
18  to be certified as to who may make the list and then
19  make their decision based on the list.  And then the
20  second week of May 2004 was sometime where we had
21  several different changes going on within the
22  Stoughton Police Department.
23    Q.  And they just never sent the list in or
24  something?

3  (Pages 6 to 9)

**CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, MA**

EXHIBIT 7

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3

4    --------------------------------x

5    ROBERT J. WELCH,

6                  Plaintiff

7                               Civil Action No.

8    vs.                     05-CV-11916GAO

9

10   CHRISTOPHER CIAMPA, individually

11   and in his capacity as Police

12   Chief of the Town of Stoughton,

13   TOWN OF STOUGHTON, RICHARD LEVINE,

14   Individually and in his capacity

15   as Select Person for the Town of

16   Stoughton, and JOHN KOWALCZYK,

17   Individually and in his capacity

18   as Select Person for the TOWN OF

19   STOUGHTON,

20               Defendants

21   --------------------------------x

22

23

24

                                                           1

Mark L. Terry, Esq. 7-28-2006
Robert J. Welch v. Christopher Ciampa, et al.

---

**18**

1 And that's the way I understood the complaint.

2    Q.  So after you were retained, what happened next?

3    A.  After I was retained, I took a look at documents

4 that Mark Stankiewicz sent to me that included, among other

5 things, the three complaints. I don't recall what else was

6 in that initial packet of information. I reviewed those

7 and scheduled the first of the interviews with the three --

8 three complainants.

9    Q.  Were all the documents from the initial packet

10 attached to your eventual -- your final report?

11    A.  Without having the report in front of me and

12 without having in front of me the initial packet, I

13 couldn't tell you for sure. I included in there -- in my

14 final report what I felt was relevant to the report. It

15 could have been that there was a newspaper article or

16 something that -- from a local paper that Mark had given me

17 or something, you know, I don't remember what was in there

18 that I didn't deem relevant and didn't include in the final

19 report.

20    Q.  Did you review the initial packet of information

21 before conducting the first interviews?

22    A.  I believe I did.

23    Q.  Did you do anything else before conducting the

24 first interviews?

---

**19**

1    A.  Other than just facilitating the scheduling of

2 those interviews, not that I can recall.

3    Q.  Do you remember anything about Sergeant Welch in

4 the initial packet of information?

5    A.  I don't recall.

6    Q.  For your first interviews, I think you said you

7 made them with the three lieutenants; is that correct?

8    A.  I believe that's correct.

9    Q.  Before making those interviews, did you reach any

10 conclusions about anybody else you might interview or get

11 suggestions from Mr. Stankiewicz or anyone else about who

12 else to interview?

13    A.  I don't recall whether I discussed that with Mark

14 or anyone else. I don't remember.

15    Q.  But you conducted the three lieutenants'

16 interviews first?

17    A.  That's my recollection, yes.

18    Q.  How did you decide who else to interview?

19    A.  My process was -- I believe I did this for every

20 single witness, the three lieutenants, as well as everyone

21 else -- was to talk with them, initially the three

22 lieutenants, asked them if they thought there was anybody

23 else that had relevant information supporting their

24 allegations, and if they gave me names, which many of them

---

**20**

1 did, I would ask them, you know, "What is it you think that

2 person would be -- would have relevant information about?"

3    And if I thought the person would have

4 information, I tried to set up another meeting to meet that

5 person; and if the person had no information whatsoever or,

6 for example, and I use this, Lieutenant Wohlgemuth, had

7 said, "Talk to these three people," and I said, "Why?" And

8 he said, "The first two were there when something that's

9 relevant happened; the other one is just a friend of mine,"

10 I would have said, "I don't need to talk to your friend."

11    Q.  Other than asking the people you interviewed, did

12 you do anything else to figure out who to interview?

13    A.  I certainly in reviewing the documents would have

14 considered whether I thought there was somebody else to

15 talk to. I don't recall coming to the conclusion that,

16 based on documents rather than conversations with

17 witnesses, that there was anyone else I needed to speak

18 with.

19    Q.  During your investigation, did you have any

20 contact with the investigator or the investigators

21 conducting the Grand Jury investigation?

22    A.  Can you give me their name?

23    MS. RANDAZZO: What do you mean by

24    investigator?

---

**21**

1    MS. SCHWAB: I guess the DA

2    conducting -- the people conducting the

3    Grand Jury investigation.

4    Q.  Do you know their names?

5    A.  I don't.

6    A.  Okay. I can tell you I did have a conversation

7 with, I believe, I don't remember if this is correct, a

8 Jabor (phon sp). And the purpose of that conversation was

9 simply to confirm that the areas that I would be inquiring

10 of with respect to my investigation wasn't going to be

11 intruding upon anything that he was concerned about, and to

12 the point where I was going to compromise a criminal

13 investigation by asking some sort of questions on an

14 internal matter.

15    Q.  Did you get any information other than from the

16 interviews on who had been called to testify before the

17 Grand Jury?

18    A.  You're asking me if I knew who was going to be

19 before the Grand Jury other than --

20    Q.  Or who had been. I think at least some of it had

21 already taken place when you began your investigation.

22    A.  I didn't -- well, let me try to answer that

23 question. I do know that some of the people that I

24 interviewed were called to the Grand Jury. I don't

---

6 (Pages 18 to 21)

Mark L. Terry, Esq. 7-28-2006
Robert J. Welch v. Christopher Ciampa, et al.

30

1   understand in order to do my investigation. So I really
2   didn't try to resolve that point, and I didn't focus on it
3   at all. So I can't tell you I have a perception as to one
4   way or the other.
5       Q.   Was it not within the scope of issues because the
6   lieutenants were explicitly against Mr. Cachopa, so you
7   didn't need to get into the nuances of the neutral people?
8       A.   The focus of my investigation was the allegation,
9   as the lieutenants termed it, the hostile work environment,
10  and specifically focusing on some of the things they
11  claimed. I think there were issues of change in duties,
12  change in shifts in particular that come to mind. The
13  question really that I was looking at was: Was that
14  retaliatory.
15      And I should mention, I think, that although not
16  in the initial complaint, Lieutenant Blount did say orally
17  that he believed some of the treatment he was suffering was
18  a result of race discrimination. That was something that
19  was not initially stated in the written complaints, but he
20  did state orally when I interviewed him.
21      Q.   At some point did you get a request from Mr.
22  Cachopa that you interview a large number of additional
23  individuals?
24      A.   I believe -- I received that through his attorney,

31

1   I believe.
2       MS. SCHWAB: We will mark Exhibit 2.
3       Q.   I've handed you a letter from yourself -- oh.
4   Actually, it was not what I intended to mark.
5       MS. SCHWAB: Can I take that back and
6       mark another Exhibit 2?
7       (Exhibit 2, 4/12/05 letter to Kevin
8       G. Powers from Marc L. Terry, marked.)
9       Q.   This is a letter from yourself to Mr. Powers, who
10  I believe is Mr. Cachopa's attorney; is that correct?
11      A.   He certainly was his attorney at the time.
12      Q.   And this addresses his request that you interview
13  32 additional individuals, correct?
14      A.   Correct.
15      Q.   It -- you request in the letter that Mr. Cachopa
16  identify which individuals have information specific to the
17  investigation and provide a brief description. That's in
18  the second paragraph. Do you see that? I paraphrased.
19      A.   Yes.
20      Q.   And did Mr. Powers or Mr. Cachopa ever provide you
21  with follow-up information?
22      A.   I don't recall that they did.
23      Q.   Did you ever interview any of the 32 individuals
24  on Mr. Cachopa's list?

32

1       A.   I don't believe that I did. Unless some of the
2   people on his list were people I had already interviewed.
3   But I don't remember which way that went.
4       Q.   Do you remember if you interviewed any individuals
5   recommended by Mr. Cachopa unless there was overlap with
6   others?
7       A.   I don't -- I don't remember doing that.
8       Q.   You also interviewed Mr. Ciampa during your
9   investigation; is that correct?
10      A.   Yes.
11      Q.   What were your impressions of Mr. Ciampa's, you
12  know, in the same way that we've been discussing your
13  impressions with the other interviewees.
14      A.   My impression of Acting Chief Ciampa was that he
15  seemed -- in some respects seemed to be playing both sides
16  against the middle. My impression was that he was almost
17  willing to make everybody else look bad. My recollection
18  is he wasn't particularly supportive of the lieutenants and
19  had his own views on what -- what their angles were,
20  although I don't recall what -- anything more than that
21  general perception now. But in some respects, he also
22  seemed to try to keep some distance between himself and
23  Chief Cachopa. That's about what I can recall.
24      Q.   Do you remember thinking that he was honest during

33

1   his interview?
2       A.   I remember him being forthright with me. You
3   know, with respect to the question of honesty for all the
4   people we're talking about, obviously I had to make some
5   credibility determinations in my report, and I defer to my
6   report then because I wrote that when it was much closer in
7   time to having done those investigations and interviews. I
8   think -- I don't recall Ciampa being reluctant to answer
9   questions or anything of that kind.
10      Q.   During the time that you were conducting your
11  investigation, did you have conversations with Mr.
12  Stankiewicz about how it was going?
13      A.   I had periodic conversations with Mark Stankiewicz
14  while the investigation was ongoing.
15      Q.   What did you talk about with him?
16      A.   Mostly he wanted to know the progress; he wanted
17  to know were people cooperating, people showing up, did I
18  feel like I was getting answers to my questions. We talked
19  about if -- for example, when I met with the lieutenants,
20  they had given me a list of other people to speak to. I
21  would tell him who those people were, and he would
22  facilitate a schedule. I would say, "This is the day I can
23  do it. Could you get the following five or six people
24  available at certain times?" And he would set up a

9 (Pages 30 to 33)

34

1   schedule and arrange a conference room. That's the gist of
2   it.
3       Q.   Did Mr. Stankiewicz give his opinion on whether
4   you should or shouldn't interview some of the people that
5   you mentioned to him?
6       A.   No. I mean, as I said before, he was, from the
7   beginning, he said, "This is your investigation, and for
8   the most part you make the decisions."
9       The only, I think, exception to that is the
10  correspondence we're talking with the chief's letters back
11  and forth and the one document you showed me and then took
12  back where the chief had basically said, "Well, go talk to
13  everybody else in the police department," effectively, and
14  I advised Mark of that request from the chief, and I guess,
15  you know, I don't remember what the rest of the letter
16  said, but addressed that issue with him.
17      Q.   Okay. I guess I'll put that letter in just so
18  it's -- just so it's clear.
19          (Exhibit 3, 4/12/05 letter to Mark
20          Stankiewicz from Marc L. Terry, marked.)
21      Q.   Okay. What's now been marked as Exhibit 3 is a
22  letter to Mr. Stankiewicz about Mr. Cachopa's
23  recommendation that you interview those 32 witnesses; is
24  that right?

35

1       A.   Yes.
2       Q.   And I think in this letter you say, you know, "If
3   I'm going to do that, it's going to cost more money, take
4   more time."
5       Did Mr. Stankiewicz respond to this?
6       A.   We had some discussion about it, you know, and
7   then I think he ultimately wanted to let the board know
8   where things were and the amount of money that would be
9   involved.
10      Q.   Did the board or Mr. Stankiewicz ever come back
11  with a -- with an answer to whether you should pursue it?
12      A.   I believe the way we handled it was I said to Mark
13  that I believed the chief was effectively trying to set him
14  up, he was trying to make it look like the investigation
15  was not thorough because we weren't going to talk to any of
16  the 32 individuals that he wanted us to, but that the best
17  thing we could do is put the ball back in the chief's court
18  and say, "Look, why are these people relevant?"
19      And if they gave us a reason to talk to them, we
20  would have to consider what the reasons were that were
21  proffered for that, for the purpose. But if he wasn't able
22  to tell us these people had information relevant to the
23  allegations, then I would make the call or at least make a
24  recommendation, further recommendation, and I don't recall

36

1   how we handled that specifically, to, you know, what to do,
2   whether to interview more people or not.
3       Q.   But you never went down that road?
4       A.   What do you mean?
5       Q.   Of making a recommendation. You never got the
6   information from Mr. Cachopa?
7       A.   I don't remember getting the information back from
8   Chief Cachopa or his attorneys saying these are the 32
9   people. I seem to recall there was a letter from Chief
10  Cachopa's attorney saying, "We're standing by our list,"
11  and didn't really give any other information. Not with
12  enough specificity for me to be able to do anything with
13  it.
14      Q.   So the issue never went anywhere after these two
15  letters of April 12?
16      A.   Not that I recall.
17      Q.   Did Mr. Stankiewicz ask you about your preliminary
18  conclusions or if you were leaning one way or the other?
19      A.   The only thing I said to him early on that
20  pertained to the allegation from Lieutenant Blount, that --
21  about the race discrimination, and I told him that I was
22  quite convinced fairly early on that there was not a
23  sustainable charge of race discrimination here. As to the
24  rest of it, I didn't want to make any comments until I

37

1   talked to everybody.
2       Q.   Was -- had he asked you about that particular
3   allegation?
4       A.   I don't recall. I mean, whether that was
5   something he asked about. He may have just said
6   generically, "Everything going okay?" Or "How's it going?"
7       I said, "Look, I have to talk to all the witnesses
8   before I give any view, and I don't want to put you in a
9   position of knowing something before it showed up before
10  it's final, but I want to tell you confidently that I don't
11  see any basis in Blount's racism case or claim."
12      Q.   Do you remember how he responded?
13      A.   I think he was pleased to hear that. That was
14  about it.
15      Q.   Did you have any conversations with attorneys for
16  the town while you were conducting your investigation?
17      A.   I remember having one conversation with Darren
18  Klein from Kopelman and Paige. As we sit here today, I
19  can't remember what the substance of that was.
20      Q.   But it was about the investigation?
21      A.   It did pertain to the -- the facts surrounding it,
22  whether it was how the investigation was going, or just
23  other facts that I might not be aware of, not -- let me be
24  clear about this. Not in terms of gathering facts, but

10 (Pages 34 to 37)

Mark L. Terry, Esq. 7-28-2006
Robert J. Welch v. Christopher Ciampa, et al.

**38**

1  Darren was, I believe, you know, involved in talking to the
2  town about the effect of this, and there was some
3  conversation I had with him, perhaps about the status of
4  the Grand Jury investigation, what he knew about where
5  things stood. Something like that.
6      So I just don't want you to think that it was
7  pertaining to what my investigation was specifically
8  tailored to as much as it was, as you know, there were a
9  lot of different things that were going on around at the
10 same time that surrounded Chief Cachopa and the Stoughton
11 Police Department, and I don't remember what the substance
12 of the conversation with Darren was.
13     Q. Did -- when you interviewed people, did you tell
14 them who else you had interviewed?
15     A. No. Let me explain that.
16     I was not in the habit of telling anybody, you
17 know, "I'm interviewing you because," for example,
18 "Lieutenant Wohlgemuth said I should talk to you." I might
19 have said, "Your name has been suggested as somebody
20 being -- having relevant information." So they may know
21 that.
22     I probably gave them background information,
23 saying, you know, "I'm doing an investigation into
24 allegations made by certain members of the police

**39**

1  department," whether I said lieutenants or not, which would
2  be self-identifying since there were only three of them. I
3  don't recall.
4      And I only would have said, you know, "So-and-so
5  said something" if it was absolutely necessary to allow a
6  person to respond to a question. You know, if there was an
7  allegation that person X said something, I might have to
8  say, you know, "Well, person X suggested you did this."
9      I don't recall that occurring, but I don't want to
10 leave you with the impression that under no circumstances
11 did I indicate that I had interviewed one particular
12 person. But I was being very careful to keep the identity
13 of the witnesses confidential; I told everyone I spoke with
14 that the investigation was confidential, and that as far as
15 I was concerned, I would not be sharing information with
16 anyone except providing a report to the town manager.
17     Q. Was it your impression that the people you
18 interviewed knew where the complaints were coming from?
19     A. I remembered some of them did. I think Sergeant
20 Welch is one of them that knew what was going on. There
21 were probably other people who gave testimony that didn't,
22 that just had no clue about it.
23     Q. What about Mr. Cachopa?
24     A. He certainly knew about it.

**40**

1      Q. Knew that it was coming from the lieutenants?
2      A. My recollection is that he had been given a copy
3  of the complaints of each of the three lieutenants and had
4  been given an opportunity to respond before I even was
5  involved.
6      Q. Did you and Mr. Cachopa discuss issues that he had
7  with anybody other than the three lieutenants?
8      A. I asked him -- I recall asking him a number of
9  questions about different people, yes.
10     Q. That would be in the script of your interview of
11 him?
12     A. Correct.
13     Q. What about Mr. Ciampa, did he seem to know where
14 the complaints were coming from?
15     A. I don't recall what he knew and what he didn't
16 know. I assume you're asking coming into the process,
17 right?
18     Q. Yes. Or during the interview.
19     A. Well, again, I certainly asked Acting Chief Ciampa
20 about some of the specific allegations, you know, the
21 office changes, another one, now that I think about it, the
22 shift changes, things like that. He knew those involved
23 the lieutenants. He knew there was a question about why the
24 lieutenants were moved from one office to another, or

**41**

1  planned to be moved. He certainly knew those facts
2  pertaining to the lieutenants.
3      MS. SCHWAB: All right. I'm going to
4  enter the report.
5      (Exhibit 4, 10/14/05 memo to Mark
6  Stankiewicz from Marc L. Terry, marked.)
7      Q. So Exhibit 4 is the report that you produced --
8      A. Correct.
9      Q. -- based on your investigation, and it has several
10 exhibits to it. Those are exhibits that you attached; is
11 that correct?
12     A. I believe my secretary actually did it.
13     Q. Before we get into the substance of the report, I
14 notice on page 2 a little more than halfway down right
15 above "Factual Background," it says that you had several
16 follow-up questions and that you contacted Chamberlin,
17 Welch, Blount, and Cachopa, and Mr. Wohlgemuth by e-mail.
18 Do you remember what follow-up questions you asked of those
19 individuals?
20     A. It -- not specifically, no, I don't.
21     Q. As to do with Mr. Welch, do you remember anything
22 about what you asked him?
23     A. I don't. I remember calling his attorney and
24 saying I had a couple follow-up questions, but I don't

11 (Pages 38 to 41)

Mark L. Terry, Esq. 7-28-2006
Robert J. Welch v. Christopher Ciampa, et al.

46

1 can submit your request to him." That was about it. But I
2 certainly didn't make any statements about what the report
3 said or any of the content of it.
4    Q. Any conversations with town counsel about it?
5    A. I don't recall. I don't recall having any.
6    Q. How about members of the Board of Selectmen?
7    A. No.
8    Q. At any point during this whole process, your being
9 retained, the interview process, and the conclusion, did
10 you ever learn that certain members of the Board of
11 Selectmen were less supportive of the investigation going
12 forward?
13    A. I don't have any specific recollection as to, you
14 know, what the board was -- I never met with the board as a
15 board. I believe one of the witnesses was Pascarelli, who
16 I think was a selectman at the time. That's the only
17 person, selectman, that I ever spoke to, unless I was
18 introduced to one passing in the hall. But the substance
19 of this, I didn't talk to anybody else.
20    Q. So did you have any idea about the board's
21 position on the investigation?
22    A. I don't recall any, any conversations about that.
23 I want to be as forthright with you as I was expecting
24 people in my investigation. I do recall Mark Stankiewicz

47

1 describing that there were certain people on the board who
2 favored Chief Cachopa, presumably, my presumption, those
3 were the ones who supported bringing him back as chief.
4 Then I assumed that they still continued to, but I don't
5 recall that now. And that there may be some people who
6 didn't see the value in doing an investigation. But that's
7 about the extent of what I recall.
8    Q. Some people, you mean members of the Board of
9 Selectmen?
10    A. Correct. Correct.
11    Q. Was it your understanding that that would be the
12 same group, that people who were supportive of Cachopa were
13 the people who didn't see the value in the investigation?
14    A. I think that's an assumption on my part, or
15 supposition. But, you know, one plus one equals two.
16    Q. So that was your assumption?
17    A. That was my assumption. I don't recall whether
18 Mark said that or not.
19    Q. When did you get that information?
20    A. I don't recall that.
21    Q. You said before that you didn't make a specific
22 recommendation in connection with the report. If asked,
23 what recommendation would you make?
24        MS. RANDAZZO: Objection.

48

1    A. I would have recommended certainly that the things
2 that I thought were done in retaliation, for example, shift
3 changes, et cetera, be undone. I also would have
4 recommended some level of discipline against the chief for
5 having taken the actions in the first place. I haven't
6 given any real thought to what level of discipline that
7 would be.
8    Q. Anything else?
9    A. Perhaps some sort of training, you know,
10 management training or something like that. But that's --
11 you're asking me now as opposed to when I did the report.
12 So that's kind of thinking out loud.
13    Q. When did you conduct the majority of the
14 interviews?
15    A. My recollection is that there was at least one gap
16 in time. For some reason March 17 sticks in my head, as
17 one interview date. Maybe it was St. Patty's Day; I don't
18 remember. I don't recall who it was. But I would say that
19 the interviews with the lieutenants occurred fairly soon,
20 by that meaning within a matter of weeks, following my
21 appointment, and I believe, again, within a matter of
22 weeks, I was able to speak with a number of the witnesses
23 that they had recommended I speak to.
24        Like I said, I know there was a gap in time on

49

1 some of the interviews. I believe generally speaking the
2 interviews were conducted between February and I would say
3 June. But I don't really recall when the last ones were
4 done.
5    Q. And then was there a several-month gap while you
6 were producing your report?
7    A. The report obviously didn't come out until
8 October, yes.
9    Q. Did you do any follow-up investigation during the
10 period when you were producing the report?
11    A. Other than perhaps the follow-up phone calls that
12 are referenced in here, which may have been done as I was
13 preparing the report and said, you know, "Gee, I didn't ask
14 this follow-up question," and reached out to whomever to
15 get the additional information; and then there was a small
16 cluster of interviews I had to do pertaining to the
17 allegation by Lieutenant Blount that the chief had tried to
18 strike him with an SUV, and I believe that was the last
19 grouping of interviews I did. I don't recall when that
20 was.
21    Q. On page 10 in your report, in your description of
22 your interview with Mr. Welch, you say about halfway down
23 the page, "Welch believed Cachopa had a hit list of people
24 in specialty assignments to remove."

13 (Pages 46 to 49)

EXHIBIT 8

# O'BRIEN &LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Robert J. Welch v. Christopher Ciampa, et al.

**Transcript of the Testimony of:**

# Joseph A. Pascarelli

# July 28, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

James A. Scally   20321

Joseph A. Pascarelli 7-28-2006
Robert J. Welch v. Christopher Ciampa, et al.

88

1  but he doesn't get into -- and another thing was we didn't
2  come up with a recommendation from him, which I would have
3  liked to have seen.
4      I know he considered it, you know, by summarizing
5  it, that there was a problem, obviously, there with
6  leadership, and that there were some things that had
7  transpired; quite honestly, he wasn't aware of all the
8  stuff and didn't touch on all the things that, you know, I
9  might know about or the three lieutenants might know about
10  or Detective Sergeant Welch, just based on the limited --
11  and it seems like a lot here because you get up to O, but
12  some of these people have, four or five of them have no
13  idea what would have transpired, you know. So based on
14  what he knew, I think it was a fair assessment of what was
15  going on, except that in my opinion, it was more than that.
16      Q.  Did you agree with the conclusions that he made?
17      A.  Other than the Blount situation, I did, yes.
18      Q.  What did you disagree with with respect to the
19  Blount situation?
20      A.  I thought that was a serious -- more serious
21  situation than he did.
22      Q.  Are you -- what are you referring to?
23      A.  The car backing up.
24      Q.  The SUV incident?

89

1      A.  The SUV incident, yes, absolutely.
2      Q.  He also makes a conclusion about Mr. Blount's
3  allegation that there is some race-based comments. Do you
4  have -- did you disagree with his conclusion that there was
5  no racial motivation for Mr. Cachopa's treatment of Mr.
6  Blount?
7      A.  Yeah, I do.
8      Q.  You disagree with that?
9      A.  Yes.
10      Q.  And you disagreed with the finding that Mr.
11  Cachopa did not try to hit Mr. Blount with his SUV?
12      A.  Right.  And there was some other situations I'm
13  sure they touched on here, and I can't remember what page,
14  but the brushing of Lieutenant Chamberlin I knew about
15  because it happened to me, and I didn't get into it with
16  Mr. Terry.
17      Q.  What do you mean by brushing?
18      A.  He, the chief, physically assaulted, if you will,
19  Chamberlin.  And he did the same thing to me.  But he --
20  his reaction was different with me than it was with Mr.
21  Chamberlin.
22      Q.  His reaction from you?
23      A.  Yeah.
24      Q.  What was your reaction?

90

1      A.  We won't get into that.  We'll have to discuss
2  that another time.  But he did the same thing.
3      Q.  You reacted?
4      A.  He did the same thing to me, yeah.  He is an
5  intimidator by nature, and he tries to do that with as many
6  people as he can get away with it.  He did a fair amount of
7  that that didn't come out in the report.
8      Q.  Any other disagreements that you have with the
9  report?
10      A.  Again, you know, based on what he had and who he
11  spoke to, you know, there's -- he'd come up with a problem
12  with leadership and the understanding that there was a problem
13  with leadership and what was going on.  But it was, to
14  my -- in my opinion, it was worse than his conclusion was.
15      Q.  And you said that the -- that Mr. Terry didn't
16  make a recommendation.  Did the board have any discussions
17  about whether to ask Mr. Terry for a specific
18  recommendation?
19      A.  No.
20      Q.  And do you know why he didn't make a
21  recommendation?
22      A.  Well, again, you know, financial reasons and
23  probably, you know, time constraints and basically not
24  accepting the report might have something to do with it.

91

1      Q.  Who didn't accept the report?
2      A.  Well, it hasn't been officially accepted.
3      Q.  By the board?
4      A.  By the board.  We haven't made it public.  So my
5  recommendation at some point would be to ask Mr. Terry for
6  a recommendation.  I mean we paid him a lot of money.  I'd
7  like to have him go on the record as coming up with a
8  recommendation.  He gives a letter and states conclusions
9  in it, but he doesn't give a recommendation.
10      Q.  Did you disagree with the decision not to make the
11  report public?
12      A.  As it stands now, I think we should have in the
13  beginning just made it public.  But, you know, there was an
14  investigation, there was a Grand Jury investigation, so I
15  thought that if it at any time would hamper the
16  investigation for the Grand Jury, that it shouldn't be
17  brought out.
18      Q.  What's your understanding of what the other
19  selectmen thought about the conclusions, whether they
20  agreed or disagreed with Mr. Terry's conclusions?
21          MS. RANDAZZO:  I'm just going to
22      object and interject at this point.
23      Joe, we have in the past gone around
24      the fact that I was present at one or more

8 (Pages 88 to 91)

CONFIDENTIAL

January 13, 2005



Atty. Marc L. Terry
Mirrick O'Connell
1700 West Park Drive
Westboro, MA 01541

Dear Atty. Terry:

Please consider this letter as written confirmation of our telephone conversation regarding the Town of Stoughton's authorization to engage the services of Mirrick O'Connell regarding an alleged hostile work environment within the Stoughton Police Department (SPD). At their January 11, 2005 meeting the Board of Selectmen voted to authorize a sum not to exceed $5,000.00 for these services. It is my understanding once the initial interviews have concluded you will provide an update if any costs are projected above $5,000.00.

As you are aware, the Town has received letters from three police lieutenants alleging a hostile work environment. Common to all three complaints involve the demotion in June 2004 and then reinstatement in November 2004 of Manuel Cachopa as the SPD Chief. In the intervening period a Grand Jury was empanelled by the Norfolk County District Attorney and a special prosecutor assigned to investigate allegations of police misconduct. Lt. Chamberlin and Lt. Blount were witnesses before the Grand Jury and allege actions taken by the Chief and the relationship with other officers constitute a hostile work environment because of their cooperation with the special prosecutor. Lt. Wohlgemuth is alleging his support of former Chief Saccardo has also made him a recipient of hostile attitudes. The Lieutenants specifically note their reassignments to different shifts and moving of their offices as supporting their allegations. I have enclosed copies of the allegations along with other related documents including the response from Chief Cachopa on the complaint.

I must caution that the number and breadth of other issues within the Town could entice individuals to request the scope of your investigation be enlarged. On that basis, I would advise that the focus of your work be restricted to the allegations of a hostile work environment.

1

EXHIBIT 9

# Memorandum

**TO:**   Mark Stankiewicz, Town Manager, Town of Stoughton



**FROM:**   Marc L. Terry, Esq., Investigating Officer

**DATE:**   October 14, 2005

**RE:**   Investigation Report – Allegations of Hostile Working Environment in Stoughton Police Department

---

## I.   INTRODUCTION

On January 13, 2005, you appointed me as the Investigating Officer to investigate the allegations of Lieutenants David Chamberlin, Francis Wohlgemuth and Michael Blount. Collectively, Lieutenants Chamberlin, Wohlgemuth and Blount asserted what they labeled a "hostile work environment" in their separate December 7, 2004 complaints. As will be elaborated upon further below, Lieutenants Chamberlin, Wohlgemuth and Blount asserted they are the victims of a hostile work environment as a result of their cooperation with an ongoing Grand Jury investigation and for supporting now former Chief Saccardo. Principally, Lieutenants Chamberlin, Wohlgemuth and Blount asserted Chief Cachopa is responsible for the hostile work environment.

After reviewing the written complaints and interviewing Lieutenants Chamberlin, Wohlgemuth and Blount, it is apparent the use of the term "hostile work environment" has been inappropriately borrowed from the parlance of employment discrimination law. More aptly, I understand the allegation to be one of retaliation, rather than a hostile work environment based on protected class status. I note, however, one substantial exception to this characterization. Although not specifically referenced in his December 7, 2004 written complaint, when interviewed, Lieutenant Blount also asserted that he was the victim of discrimination based on his race (African American).

## II.   INVESTIGATION

In connection with this investigation, I interviewed the following individuals:

A.   Lieutenant David Chamberlin
B.   Lieutenant Francis Wohlgemuth
C.   Lieutenant Michael Blount
D.   Sergeant Robert Welch
E.   Officer Alan Curtis
F.   Officer Tracey Sisco
G.   Officer Craig Lepro

H.      Officer Chuck Roberts
I.       Selectman/Officer Joseph Pascarelli
J.       Sergeant/Acting Chief Christopher Ciampa
K.      Chief Manuel Cachopa
L.      David Tonis, Building Commissioner
M.     Thomas Rorrie, Treasurer /Collector
N.      Theresa Cardoso, Treasurer/Collector's Office
O.      Mark Stankiewicz, Town Manager

At the beginning of each interview, I advised the witness that the Town retained my Firm solely for the purpose of investigating the above allegations. I further advised each witness that the investigation was confidential, which meant I would not reveal their statements, except to the Town Manager, and that they were not to discuss their statements or the investigation with anyone. I explained, however, that my investigation report may be subject to disclosure under the Commonwealth's Public Records law.

Blount, Welch and Cachopa each had counsel present during their interviews. All other witnesses were interviewed alone.

At Cachopa's request, his interview was audio taped. No other interviews were audio taped.

Each witness was given the opportunity to identify other individuals who s/he believed may have information relevant to my investigation and what information they believed any such witness had. If I deemed the information relevant to my investigation, I interviewed the individual. Summarized below are all witnesses' statements.

After completing my initial interviews of the above individuals, there were several follow up questions I had to ask. Through counsel, I contacted Chamberlain, Welch, Blount and Cachopa. I also communicated by email with Wohlgemuth. I made several attempts to contact Ciampa. He did not, however, respond to my inquiry. The information obtained through counsel is included in my summary of the witnesses' statements below.

III.    FACTUAL BACKGROUND

The Stoughton Police Department is comprised of one chief, three lieutenants, eight or nine sergeants and 42-45 patrol officers. Prior to December 2004, sergeants were patrol supervisors. The lieutenants were assigned as the administrative lieutenant (Chamberlin), operations lieutenant (Wohlgemuth) and internal affairs lieutenant (Blount).

Prior to meeting with any witnesses, I was presented with the following chronology. In 2003, Cachopa received information regarding an allegation of criminal wrongdoing by a member of the Stoughton Police Department. Cachopa assigned Blount and Welch to investigate the allegation.

In the spring of 2004, the Board of Selectmen decided not to renew Cachopa's appointment with the Town, effectively demoting him to the rank of lieutenant in accordance with civil service law, which applies to all sworn positions within the Stoughton Police

Department, except for the position of Chief of Police. Thus, as of July 1, 2004, Cachopa was reduced in rank from chief to lieutenant. Chamberlin was then appointed as the acting chief, an assignment he held until October 2004 when the Board of Selectmen appointed Joseph Saccardo, as Cachopa's successor.

Less than one month following Saccardo's appointment, there was a hotly contested recall election for two members of the Board of Selectmen. The two incumbents lost, reportedly as a result of their votes not to reappoint Cachopa as chief of police in June. Conversely, the two individuals elected were reportedly elected for their support of Cachopa and their promise to return him to office if elected.

On November 19, 2004, after the decision to reinstate Cachopa and the other officers to active duty, Saccardo held a press conference, at which Chamberlin, Wohlgemuth and Blount stood behind Saccardo in a show of support. At the press conference, Saccardo stated a hostile work environment existed in the Police Department.

After the recall election, which resulted in the recall of two new members of the Board of Selectmen, and the election of two new members, the newly constituted Board voted to terminate the services of Saccardo, on or about November 23, 2004, and to reappoint Cachopa as chief.

Shortly after Cachopa's reappointment as Chief, Chamberlin, Wohlgemuth and Blount filed their complaints.

## A.   Interview with Lieutenant Chamberlin

On December 7, 2004, Lt. Chamberlin submitted a memorandum to Town Manager Mark Stankiewicz titled, "Hostile Work Environment in Stoughton Police Department." (See Exhibit 1.) In his memorandum, Chamberlin asserted former Chief Saccardo stated publicly that a hostile work environment existed in the Stoughton Police Department. At the time of Saccardo's public comment, Chamberlin, Blount and Wohlgemuth physically stood behind Saccardo, at least giving the appearance of support for Saccardo's statement. Shortly after Saccardo's statement, Saccardo was removed from office and Cachopa was reinstated.

Chamberlin asserted that within days of Cachopa's reinstatement, Cachopa changed Chamberlin's shift and duties, and ordered him to move his office from the lieutenants' office to the sergeants' office. (See Exhibit 2.) He asserted further that derogatory material was left in his Department mail slot. Chamberlin also expressed concern for his health and safety because it was known within the Department that he had been cooperating with the District Attorney's Office in the criminal investigation of seven members of the Department, including Cachopa, and two of the officers with whom he was being assigned to share office space.

During my interview of Chamberlin, he stated as follows:

He has been a member of the Stoughton Police Department since 1975, having been promoted to the rank of lieutenant in approximately 2001.

Chamberlin was appointed as the Interim Chief of Police when Cachopa's appointment was not renewed in July 2004. In August 2004, Cachopa, along with several other members of

officer punishment duty rather than a suspension. Neither Chamberlin nor Blount were ever granted the authority to suspend despite Wohlgemuth's suggestion to do so.

On July 25, 2005, I received a facsimile from Wohlgemuth. (See Exhibit 11.) The facsimile included a written warning Ciampa issued to Wohlgemuth on May 3, 2005 for making comments that others construed as offensive and hostile. Wohlgemuth also attached his July 22, 2005 written response to Ciampa. In his written response, Wohlgemuth admitted making some, but not all of the comments attributed to him by Ciampa. Wohlgemuth also took issue with Ciampa's decision to impose discipline without first obtaining his statement regarding the alleged incident.

### C.   Interview with Lieutenant Blount

Lt. Blount gave Town Manager Stankiewicz a memorandum, dated December 7, 2004, entitled, "Hostile Work Environment – Request for Protection." (See Exhibit 12.) In his memorandum, Lt. Blount alleged the existence of a "tension filled and dangerous atmosphere" as a result of the reinstatement to active duty of the officers under indictment. Blount stated further, "Because I have cooperated with [the Grand Jury], publicly supported deposed Saccardo and other reasons, I have been the victim of criminal assault, witness intimidation and other acts of retaliation." Blount specifically cited his assignment to the 12 am to midnight shift and asserted he was effectively stripped of his duties. Blount also asserted he was retaliated against by placing him in the sergeants' office along with the two other lieutenants and noted that the office assignment forced him to share an office with two individuals who were under investigation by the Grand Jury and who were aware of his cooperation with the investigation.

During my interview with Blount, he stated as follows:

He was assigned as the Internal Affairs Officer in September 2002. In 2003, Cachopa assigned him to investigate an allegation against Sergeant Cohen and told him to "get rid of this." At first Blount did not think there was much to the complaint. After having investigated further, he found inconsistencies in Cohen's statements and advised Cachopa of same. Cachopa asked Blount why he was "digging so deep." He thought Cachopa wanted to "whitewash" the investigation. Blount advised Cachopa he wanted to consult with the District Attorney to protect the rights of the individuals involved. Blount requested a subpoena for Sgt. Cohen's phone records, but Cachopa denied that request. Cachopa asked Blount what was taking so long to complete the investigation. Blount told Cachopa he was at an impasse because the District Attorney's investigation was still pending. Cachopa directed him to complete his report. Blount advised Cachopa that charges against the complaining party should be dropped, but made no findings with respect to Cohen.

In 2002, Cachopa made a comment about a black computer. Blount confronted Cachopa about it and Cachopa went "berserk." Cachopa was so angry he was spitting as he was speaking, gritted his teeth, jabbed his finger at him and tried to convince Blount that he (Cachopa) was not a racist.

On November 15, 2004 at 9:50 a.m., Blount had been speaking to Tonis in the rear of the Town Hall parking lot. His conversation with Tonis ended and, as Tonis was walking away from

him, a large, dark colored SUV appeared to be accelerating and moving at a fast rate of speed (for a parking lot) from the direction to which Tonis was walking and coming from behind Blount. The SUV passed him by the length of the vehicle plus 10 or 12 feet, broke hard, but did not stop, and then, the driver put the transmission in reverse, causing the transmission to make a clunking sound and the tires locked up briefly as the vehicle then began to back up toward Blount's position. Blount feared the vehicle was going to strike him and moved reflexively out of the way of the vehicle. The vehicle stopped about 5 feet from him after he moved out of the way with the driver's window even with Blount's position. Blount identified Cachopa as the driver of the vehicle. Cachopa stared at him with a "menacing expression on his face." Blount and Cachopa stared at each other for approximately 30 seconds. Blount then regained his composure and began to walk toward the Town Hall – his original destination. Blount believed he would have been struck by the vehicle had he not moved out of the way. Blount immediately advised Saccardo, Stankiewicz and Chamberlin of the incident. Blount asserted the incident constituted criminal conduct.[2] Blount wrote a memorandum on November 15, 2004 to Saccardo regarding the above incident. (See Exhibit 13.) He also prepared a sketch of the incident during his interview. (See Exhibit 14.)

After Cachopa was reinstated to active duty from administrative leave, Cachopa would glare at him at least daily and say, "lawsuit." Cachopa refused to talk to him, Chamberlin and Wohlgemuth.

Within 24 hours of Cachopa's reappointment as Chief, Chamberlin, Wohlgemuth and Blount had their office assignments changed (although Wohlgemuth never actually changed offices). The purpose of the office change was to humiliate the lieutenants for the recommendation that the Town hire a consultant, and to retaliate against them for exposing corruption within the Department, supporting Saccardo and opposing Cachopa. Blount stated he had no knowledge of the proposed restructuring until he was advised of his change in duties by memorandum dated December 3, 2004. (See Exhibit 15.) Blount was stripped of his authority as Internal Affairs Investigator and has been assigned as the shift supervisor, which had previously been done by sergeants. Blount was also assigned the unpopular duties of scheduling and billing.

Blount asserted he was discriminated against based on race because he did not have internet access, because Cachopa highlighted Blount's role in stopping SuperBowl in January 2004 betting in the Department and because his request for a cell phone was denied in September 2003. (See Exhibits 16 & 17.)

Cachopa told Blount he would never be Chief of Police because no one likes him. Blount believed Cachopa made sure no one liked him.

Cachopa would not support Blount's requests for discipline against other officers because they supported him (Cachopa) and because he was sending a message that officers did not have to listen to the "black lieutenant." Chamberlin never dealt with discipline and Wohlgemuth only sought to impose discipline twice. There was no discipline imposed in the Department from

---

[2]  It is my understanding this incident was referred to the State Police for investigation. I note that whether this incident constitutes a crime is beyond the scope of this investigation.

1994 until the spring of 2004, when Cachopa suspended two officers (after having been criticized for not imposing discipline by the Board of Selectmen).

In February 2004, Cachopa threw a "tantrum" because Blount filed a complaint with the Postal Inspector regarding a letter he believed had been sent to his wife alleging he (Blount) had an affair with another woman. Cachopa gritted his teeth and his eyes were bulging and came at Blount in a menacing manner. Cachopa asked him for a "to/from" regarding why he went outside of the Department with his complaint. Blount stated Cachopa apologized and said he would order an internal investigation. Blount decided not to pursue a complaint because he believed Cachopa had already compromised the investigation. Blount provided me with a copy of a February 14, 2004 memorandum to Cachopa regarding the letter to his wife and a February 15, 2004 typed summary of his conversation with Cachopa regarding same. (See Exhibits 18 & 19.)

Blount sent a memorandum, dated December 15, 2004, in which he complained that Ciampa gave him a letter regarding derogatory remarks he allegedly made to another officer about Ciampa without first getting Blount's version of incident. (See Exhibit 20.) Cachopa would always talk to the accused officer before deciding whether to impose discipline, but did not do so in this case.

On February 7, 2005, Blount forwarded a series of three memoranda from/to Ciampa regarding missing E-911 tapes. Blount felt Ciampa's memoranda were threatening. (See Exhibit 21.)

On April 13, 2005, Blount received a written warning for failing to arrive on time for training to which Blount responded on April 14, 2004. (See Exhibit 22.)

On July 14, 2005, Blount sent a letter to Ciampa alleging violation of the state whistleblower statute. In his letter, Blount requested Ciampa step down from the position of Acting Chief, that the senior Lieutenant (Wohlgemuth) be appointed as Acting Chief pending resolution of the criminal charges against Cachopa, that the "illegal" position of executive officer be abolished, that he (Blount) return to the day shift and to his old office, and that all reprimands, memoranda and letters issued to him since November 1, 2004 be expunged from his file. (See Exhibit 23.)

D.   **Interview with Sergeant Welch**

During my interview of Sergeant Robert Welch, he reported having been intimidated, having had his assignments changed, having received retaliatory communications, having had toy rats placed in his Police Department mailbox and having to deal with a stressful atmosphere in the Police Department. Specifically, Welch stated as follows:

He and Blount were assigned to investigate the allegations against Cohen. After the officers under investigation were returned to active duty in November 2004, the officers who returned made it miserable for him. Welch received phone calls in which the caller would say, "f---ing rat" and hang up. People would bang on his door and make the same comment. He was afraid to go into the Police Department. Some of his friends and neighbors were told to separate themselves from him.

**Exhibit #29**

### 3/17 Interview of Chief Manuel Cachopa

| | |
|---|---|
| Attorney Terry | This is the interview of Chief Manny Cachopa in an investigation that I am conducting. My name is Marc Terry. Why don't I have everyone in the room and present identify themselves for the tape. |
| Attorney Powers | Yes my name is Kevin Powers and I represent Chief Cachopa. |
| Chief Manuel Cachopa | I am Manuel Cachopa the Chief of Police of Stoughton. |
| Attorney Terry | This interview is being tape recorded at the request of Chief Cachopa. Would all parties present identify and state that they consent to being recorded? |
| Attorney Powers | Yes, Kevin Powers. I consent. |
| Chief Cachopa. | Manuel Cachopa and I consent. |
| Attorney Terry | And I Marc Terry also consent to being recorded. The parties have agreed that the tapes will be taken into my possession after the interview. I will make a full recording of them and provide a copy back to Attorney Powers on behalf of Mr. Cachopa. Before we get into anything in substance Chief, I just want to make sure you understand that you're giving any answers voluntarily, and that you understand you are not ordered to answer a question. I state that specifically because I understand you are under indictment and I want you to understand that anything that you say here can and will be used as anybody else may deem appropriate. As you know, I am not a law enforcement officer. I am a private attorney and I have been hired to do this investigation. But, I want to make sure that you understand that what we say here can be used against you. |
| Chief Cachopa | Yes sir. |
| Attorney Powers | Okay. |

Q Do you ever bang shoulders intentionally with other Sergeants, I'm sorry, Lieutenants?

A No.

Q Did you ever make the comment in reference to a black computer as being provided to Lieutenant Blount?

A Yes sir.

Q What was that comment?

A The comment was "Well, the computers are white here and you got a black one."

Q And why did you say that?

A It was a joke.  It was a joke.

Q And were you playing on the fact that Lieutenant Blount was black and the computer black?

A I was playing on the fact that Lieutenant Blount has freely made jokes about his own race and I thought I had a rapport with him where it was just a joke.  It was certainly a joke.

Q You talk about rapport with Lieutenant Blount, can you describe your general relationship to Lieutenant Blount, say, January '04, randomly.  How did you get along with Lieutenant Blount?

A Very well I thought.

Q Did that change at some time?

A Yes it did.

Q When?

A When I was put on leave.

Q You are talking about October, November of '04?

A I believe so

Q Why did that change?

A I have no idea.

EXHIBIT 10

## Investigation of the Arrest of Nancy M. Francis

### Summary

Ms. Francis was arrested by Officer Paul Williams on February 11, 2005 at approximately 11:30 p.m. for operating under the influence of alcohol. (See arrest report attached hereto as Exhibit "A"). During the booking process she began to complain of physical problems and notified the officers that she was a diabetic. The Fire department was called and after checking Ms. Francis out, they decided to transport her to the Good Samaritan Hospital. Officer Williams notified Lt. Blount, who was coming on duty at midnight, and Lt. Wohlgemuth who was in charge of the 4-12 shift. Officer Williams suggested that his arrest be changed to a summons so that the police department would not be responsible for guarding the prisoner at the hospital for a long period of time. Lt. Blount and Lt. Wohlgemuth agreed.

After speaking with the lieutenants, Officer Williams proceeded to the front console and ran a board of probation and warrant check on Ms. Francis, as is normal procedure. As a result of this check, Officer Williams learned that Ms. Francis had two outstanding warrants. Officer Williams then proceeded back into the lieutenants office and informed both Blount and Wohlgemuth that Ms. Francis was indeed under arrest for the warrants as is required by law. (See Massachusetts General Laws, Chapter 268, sections 22 and 23, attached hereto as Exhibit "B"). According to Officer Williams, Lt. Blount agreed that Ms. Francis was now in police custody. Lt. Blount then assigned Officer Stewart Mellyn and the matron, Dorothy Canale to guard the prisoner at the hospital.

After a period of time, Lt. Blount ordered Officer Michael Doyle to the hospital to relieve Officer Mellyn. While Doyle was at the hospital, he learned that Ms. Francis was going to be admitted. Sometime after this information was relayed to Lt. Blount, Officer Doyle was relieved of his guard duty and the prisoner was left unattended at the hospital in violation of department policy.

The following day, Sgt. Thomas Murphy was in charge of the 8-4 shift and was advised by Lt. Blount that we had a female prisoner at the Good Samaritan Hospital and that she was unattended. Sgt. Murphy questioned the wisdom of that decision. (See statement of Sgt. Thomas Murphy attached hereto as Exhibit "C"). Ms. Francis was left unattended until Saturday night, at which time she began to create a disturbance at the hospital and Sgt. Robert Devine arranged to have her guarded.

On or about February 15, 2005, I learned of this incident and requested an explanation from Lt. Blount. Lt. Blount replied that he would have to speak to all of the officers involved before responding. On March 3, 2005 I again requested a response. The following day, Lt. Blount provided me with a written explanation dated March 2, 2005. (See memo of Lt. Blount attached hereto as Exhibit "D").

### Conclusion

The explanation provided by Lt. Blount is riddled with inaccuracies and contradictions. First, Lt. Blount claims that when Ms. Francis left the police station by ambulance she was no longer our prisoner. After Officer Williams informed the

lieutenants that there were active warrants on Ms. Francis, he proceeded back to the booking area where Ms. Francis was on a stretcher being wheeled to the ambulance. Ms. Francis was in fact a prisoner at that moment and Lt. Blount knew this.

Lt. Blount then informs us that he had Officer Mellyn return to the station to pick up the matron and bring her to the hospital "to check on her status." Officer Mellyn was in fact sent to the hospital to perform guard duty with the matron because of the fact that she was in our custody. It is not the policy, nor is it normal procedure of the Stoughton Police department to check on the status of individuals taken to the hospital who are not in our custody. Furthermore, Officer Mellyn and the matron were stationed at the hospital and did not return after learning of Ms. Francis status. Officer Doyle was then sent to the hospital to relieve Officer Mellyn which is standard practice when a prisoner is at a facility for a long period of time. After Officer Doyle reported that the prisoner was due to be admitted, ostensibly so that a detail and matron schedule could be arranged, Lt. Blount decided to pull the guard and leave the prisoner unattended in violation of department rules and policy. (See Stoughton Police Department policy and Rules of Conduct, #27, Care and Transportation of Prisoners, attached hereto as Exhibit "E")

Lt. Blount asserts that Ms. Francis was not under arrest and he saw no need to "re-arrest" her at this point in time. Despite his assertions that Ms. Francis was not under arrest he took the following actions:

1. He assigned an officer and a matron to the hospital for guard duty,
2. He relieved that officer with a second officer,
3. He informed the oncoming supervisor that we had a prisoner at the hospital who was unattended.

As final proof that Ms. Francis was indeed in police custody, she was bailed by order of Judge Francis Crimmins of Stoughton District Court, from the hospital on the warrants on Monday, February 14, 2005.

**Recommendation**

The fabrications contained in Lt. Blount's statement show a continuing pattern of deceit on his part. Instead of admitting to violating a department policy, either out of ignorance of the policy or mistake, Lt. Blount felt that he had to cover up his error by fabricating a story that is inconsistent with the facts as they occurred. Lt. Blount attempts to justify his actions rather than admit his mistakes. Had Lt. Blount admitted that he should have arranged for the prisoner to be guarded while in our custody, he would have been given a verbal counseling and the matter would have ended there. Instead Lt. Blount lied and filed a false statement.

As stated above, this appears to be a continuing pattern of behavior on the part of Michael Blount. Previously, he falsely accused Manuel Cachopa of attempting to run him down with a motor vehicle. Previous to that, he was involved in an incident involving the arrest of Rocco Amaru which was investigated by the Town's insurance company. During the interviews conducted by the investigator, (of which I was present for each interview), five parties involved in the incident claimed that Lt. Blount told the arresting officer, (Arlindo Romeiro), that Mr. Amaru had an active warrant and that Romeiro could enter the house and arrest Amaru. Lt. Blount denied this claim despite the fact that two of the individuals who claim that Lt. Blount made the statement were

2

sitting on the desk and heard Lt. Blount make the statement to Officer Romeiro on the phone. Again, Lt. Blount made an honest mistake, yet instead of owning up to it, he concocted a story to justify his actions. In this case, Officer Romeiro was disciplined for the actions of Lt. Blount.

The fact that Lt. Blount seems to consistently make bad decisions in his role as supervisor is problematic, however if that were the only problem it could be addressed with re-training and counseling. The insidious problem with Lt. Blount is that he refuses to admit mistakes and will go to any lengths, including lying and filing false reports to justify his actions.

Section F, subsection 34 of Required Conduct, in the Stoughton Police Department Policy and Procedure Manual states that "An officer shall truthfully state the facts in all reports as well as when he appears before any judicial, departmental or other official investigation…" (See Section F, attached hereto as Exhibit "F") Section G, Prohibited Conduct subsection 1 defines conduct unbecoming and Officer as "The commission of any specific act or acts of immoral, improper, disorderly or intemperate personal conduct which reflects discredit upon the officer himself, upon his fellow officers or upon the Police Department." (See Section G, attached hereto as Exhibit "G").

It for the reasons stated above that I would recommend that Lt. Michael Blount be terminated from his position for filing false police reports in violation of Section F, subsection 34 of the Stoughton Police Department Policy and Procedures and violation of Section G, subsection 1, conduct unbecoming an officer and violation of Massachusetts General Laws, chapter 268, section 6A. (See attached hereto as Exhibit "H").

Christopher Ciampa
Acting Chief of Police
March 16, 2005

3

EXHIBIT 11



SHOP LEVI.COM ›
FREE SHIPPING*

SEE
NEW FOR SPR

boston.com **Local News**    your connection to The

Home  News  A&E  Business  Sports  Travel  Your Life  Cars  Jobs  Personals  Real Estate    Sign In  |

Today's Globe  Local  Opinion  Politics  Magazine  Education  NECN  Special reports  Deaths    Traffic  | '

Advertisement

- HOME >
- NEWS >
- LOCAL >
- MASS.

STOUGHTON

# Acting chief 'just keeping the seat warm'

The Boston Globe



LeadBac

the best ad targeting
retargeting. learn wh

‹ Click here

By Maria Cramer, Globe Staff  |  March 20, 2005

Manuel Cachopa's name plate still sits on his desk. So do the ousted Stoughton police chief's business cards. And on the bookshelf is a teddy bear in a police uniform with a sash bearing his name.

Acting Police Chief Christopher Ciampa hasn't touched any of those items since Cachopa was placed on paid administrative leave March 5, after a Norfolk County grand jury returned criminal indictments against Cachopa and another Stoughton Police officer, Sergeant David M. Cohen.

"I'm just keeping the seat warm," Ciampa said on March 11, barely a week after the Board of Selectmen picked him to lead the department while Cachopa's fate hangs on the outcome of the court case.

The seat has been uncomfortable at times, he said. Ciampa is the fourth person to take the position since June, when selectmen demoted Cachopa and installed Lieutenant David Chamberlin as acting chief. Chamberlin was then replaced by permanent chief Joseph Saccardo, but Saccardo was quickly fired by a new Board of Selectmen, which reinstated Cachopa in November.

Cachopa is accused of trying to intimidate Canton resident Timothy A. Hills into dropping a complaint against Cohen and covering up alleged illegal actions by the sergeant. Cohen, a lawyer, was indicted on allegations of extortion, intimidating witnesses, abusing his position as an officer, filing a false report against Hills, and beating and assaulting Hills. Five other Stoughton police officers remain under investigation by the grand jury for alleged police misconduct in separate incidents.

Ciampa, 45, said he has been busy fielding complaints from residents about officers, trying to inspire a despondent rank and file, taking heat from people who believe he was unfairly promoted, and defending the seven officers in the grand jury probe, which he believes is politically motivated. Ciampa was

GO

called before the grand jury, but he said he invoked his Fifth Amendment right against self-incrimination on the advice of police union counsel.

Selectmen passed over three lieutenants, Michael Blount, Chamberlin, and Francis Wohlgemuth, for Ciampa, whom Cachopa had appointed as executive officer in November.

"He's highly qualified both in education and experience to take over as the acting chief," said Selectman Richard Levine. "Lieutenant Chamberlin hasn't been in work since November. Lieutenant Wohlgemuth is not interested in taking over as the chief, and Lieutenant Blount was not considered qualified."

The lieutenants' recent complaint about a hostile work environment also factored into the decision, Levine said. "We know they would not have the backing of the uniformed officers," he said.

Blount could not be reached for comment. Wohlgemuth declined comment.

"We have a right to file a hostile work environment" complaint, said Chamberlin, who is on sick leave.

Ciampa immersed himself in last year's effort to recall two selectmen who had voted to demote Cachopa. He even hosted a local cable television show, "Enough is Enough," to defend the officers publicly and help Levine and John Kowalczyk oust Selectmen Robert Mullen Jr. and Gerald Goulston. Levine and Kowalczyk were elected in November.

But Ciampa said he will stay out of the April election, when Selectmen Antonio Sousa and Levine, who voted to reinstate Cachopa, face Julie-Leah J. Harding and Debbie Ito-Bingamon. His only political action will be casting a vote, he said. For now, he said, he is concentrating on performing his duties as chief.

"The only thing that I would ask of anyone is to judge me on the job that I do," he said.

Ciampa said he wants to open the Police Department to scrutiny, and invites even its critics to come with questions and comments.

The acting chief's policy is encouraging, said Harding. But she also said she is troubled by Ciampa's statements that criminals fear the Police Department. "I do fear certain things, but that doesn't make me a criminal," she said.

Harding complained that two officers had lurked around her March 5 campaign event, which Saccardo attended. The next day, a flier appeared in the Police Department's roll-call room stating that a vote for Harding was a vote for Saccardo.

Ciampa said the flier was posted on the police union's bulletin board, where members are allowed to put announcements. But when he learned that copies of the flier also were distributed in mailboxes, Ciampa said, he told officers that was inappropriate.

"The mailboxes are meant for department correspondence, not union correspondence," he said.

LATEST LOCAL NEWS

- ▶Cut-rate campus
- ▶The Inauguration of Presid Obama
- ▶10 smart tips for college fu
- ▶20 best places to kiss in B
- ▶Flirting 101

▶See full list of most e-mailed

[          ]  GO

- ○ Today (free)
- ○ Yesterday (free)
- ● Past 30 days
- ○ Last 12 months
- ▶ Advanced search / Historic Archives

ADVERTISEMENT

Case 1:06-cv-11504-NG   Document 29-3   Filed 02/04/09   Page 52 of 55

Jerry Capozzoli, a local business owner who supported Goulston and Mullen, said he remains upset by a statement Ciampa made last fall on the last episode of "Enough is Enough."

"I have a suggestion for Jerry: If you really want to make Stoughton a better place, move," Ciampa had said on the program.

"I do feel intimidated," said Capozzoli, who says Stoughton officers had arrested him wrongfully in the past. "I can hardly sleep anymore."

Ciampa said he "wasn't trying to intimidate Jerry Capozzoli," and was responding after he heard about Capozzoli making rude remarks regarding a candidate's family.

Capozzoli said he was only reacting to insults hurled at him during a campaign event in town.

Critics are comfortable slamming a vulnerable department, Ciampa said.

"They feel we're down," he said. "They have the forum."

Maria Cramer can be reached at mcramer@globe.com.■

© Copyright 2006 Globe Newspaper Company.
◀ 1 2 ▶

Ads by Google                                                what's this?

**Stoughton Homes For Sale**
See Stoughton MA Home Listings View Maps, Photos & Detailed Info
www.HomeListingsFinder.com/MA

**2009 Diet Of The Year**
Finally, a Diet that Really Works! As Seen on CNN, NBC, CBS & Fox News
www.Wu-YiSource.com

**Police Arrest Records ?**
Lookup Free Arrest Records On Anyone Right Now! Official Service®
PoliceArrests.GovArrestRecords.com

More:

- Globe City/Region stories |
- Latest local news |
- Globe front page |
- Boston.com

  Sign up for:
- Globe Headlines e-mail |
- Breaking News Alerts

- Printer friendly
- Single page
- E-mail to a friend
- Mass. RSS feed
- Available RSS feeds
- Most e-mailed

-  Reprints & Licensing
- ■ Save this article
-     powered by Del.icio.us



Bentley Portfolio 360
Graduate Business
Programs

A year-long celebration
of all things Scottish!

Do

Find ways to make a
difference



Let your new home
find you with email
alerts

feedback
form |
help | site
index |
globe
archives |
rss
© 20 The
New
York
Times
Company

**HOMEOWNERS:**
Mortgage rates have
dropped as low as 4.87% APR.

$200,000
for Only
$1,106/month

$300,000
for Only
$1,680/month

$400,000
for Only
$2,209/month

EXHIBIT 12

heart from city employees.

Flaherty unveiled the first policy proposal of his campaign yesterday: creation of a robust system of suggestion boxes for city employees, with the ideas posted twice a week on a website for public viewing.

"Some of our city's greatest resources are our roughly 18,000 ...

dress, and drop boxes throughout City Hall

Not to be outdone, Mayor Thomas M. Menino's office responded that Menino has already launched a virtual suggestion box of his own, in December, called "Think BIG, Bright Ideas for Government."

The key difference: The sug-

said, response from employees has been "modest," but she could not say how many suggestions have been received.

"It is a bit of a culture shift, so people are reluctant to offer opinions about other lines of business other than their own," Weenick said in an interview.

Nick Martin, a spokesman for

---

# Suspect in rape may be linked to Hub assaults

A Framingham man who may have been involved in several sexual assaults in the Boston area was arraigned yesterday, accused of robbing and assaulting a woman he met through a prostitution ad on Craig's List, authorities said.

Reinaldo Prado, 27, was arraigned in Woburn District Court on charges of armed robbery, rape, assault and battery with a dangerous weapon, and intimidation of a witness, said Detective Matthew Leary of the Burlington Police Department.

"We do believe there may be more incidents with this individual, with the possibility of some of them being unreported," Leary said. "There are similarities in this case with other incidences."

He would not elaborate because it is an ongoing investigation.

Leary said Prado allegedly assaulted the woman at a Burlington hotel on Jan. 24.

Prado is being held without bail pending a dangerousness hearing on Thursday, at which a judge will determine whether he is eligible to be released on bail.

**— JENNA NIERSTEDT**

---

# Officer wins $165,000 in suit against Stoughton

**By Jenna Nierstedt**
GLOBE CORRESPONDENT

A Stoughton supervisor of detectives who was removed from his post in 2005 won a federal lawsuit against the town yesterday after claiming his demotion was retaliation for participation in the investigation of police misconduct involving an officer and former chief Manuel Cachopa.

Robert Welch was awarded a judgment of $165,000, plus interest and attorneys' fees, from a jury in state District Court on the grounds that former Acting Police Chief Christopher Ciampa removed Welch from his position because he had investigated a 2002 extortion case involving Cachopa and former police sergeant David M. Cohen.

"He was assigned . . . to assist the special prosecutor in the grand jury investigation," said Welch's attorney, Hillary Schwab of Boston, about Welch's duties investigating the police case. "He served subpoenas and interviewed witnesses. It was not an assignment he wanted. Nobody wants to have to investigate police officers in their own department."

Judge Patti Saris has the option to reinstate Welch as a supervisor.

Stephen Pfaff, the Boston attorney who represented Ciampa, last night said, "We're not happy

with the decision but we respect the jury's verdict. [We] don't know where we're going to go with this at this time," he said of any possible appeal.

Board of Selectmen chairman John Kowalczyk and Town Manager Mark Stankiewicz did not return calls for comment.

In his suit, Welch also asserts he refused to publicly support a petition to recall two of the five selectmen responsible for removing Cachopa from his position. Selectmen Robert Mullen Jr. and Gerald Goulston lost their seats in the recall; two others were installed who supported the reinstatement of Cachopa.

On June 28, 2005, Ciampa informed Welch that he was not going to be reappointed to the supervisor position, according to court papers from the suit.

In 2007, Cohen was convicted of witness intimidation, attempted extortion, and filing a false report after a Canton businessman, Timothy Hills, filed a complaint against him. He is serving a three-year prison sentence.

Cachopa was convicted Jan. 23 of this year of being an accessory to attempted extortion. Prosecutors said he used his authority as chief to threaten Hills to drop a complaint of misconduct against Cohen. His sentencing is set for this month.